(No. 41298.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* MICHAEL HAMMOND, Appellant.

*Opinion filed May 20, 1970.*

GERALD C. CHRISS, of Chicago, appointed by the court, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (JAMES B. ZAGEL, Assistant Attorney General, of counsel,) for the People.

Mr. JUSTICE CULBERTSON delivered the opinion of the court:

Defendant was convicted of the offense of murder after a bench trial in the circuit court of Cook County and sentenced to imprisonment for a term of not less than 25 nor

more than 30 years. Being a juvenile (13 years of age at the time of the offense), he was, upon receiving his sentence, committed to the Illinois Youth Commission. On this appeal, defendant contends that the trial court violated his constitutional rights by failing to conduct a hearing on the question of his competency to stand trial, and it is further urged that the State has not proved him guilty of the offense charged beyond a reasonable doubt.

During the trial the State proved that on December 8, 1966, defendant, the decedent Robert Richardson, and one Alfred Webster "played hookey" from school, broke into the home of a deputy sheriff on the south side of the city of Chicago and obtained some guns. The three were arrested for this burglary and brought before the Family Court. The State's Attorney, however, told the decedent and Alfred Webster that they did not have to appear again in Family Court after their first appearance. The defendant was the only one who was required to reappear, and he admittedly had "hard feelings" about such circumstance. At the first hearing in Family Court with regard to the burglary charge, Alfred Webster testified against defendant. The case was continued until February 20, 1967, and before any further testimony was taken, the decedent was found dead in his home with three .25 caliber gunshot wounds in his head.

The State's principal witness, 14-year-old Larry Williams, stated that on the afternoon of February 7, 1967, he and defendant met one Daryl Chaney, age 14 at the time of the trial, across the street from defendant's home. The boys went over to defendant's house, where defendant asked Williams if the latter wanted to show Chaney a gun which, according to Williams, had been stolen from a house earlier that day by Williams and defendant. After Williams displayed the gun to Chaney, defendant is said to have indicated his desire to kill the decedent. (This gun, which was introduced into evidence by the State, was, according to the uncontradicted testimony of a police ballistics expert, the

same gun which fired the bullets recovered from decedent's head.) Continuing with Williams's trial narrative, the three boys commenced a search for decedent. They went to Hinton School and the homes of two of their friends, and then went to decedent's apartment building. Defendant stayed outside because he didn't want to be recognized, and when Williams and Chaney knocked on decedent's door, they were told by a lady in the building that no one was home at the decedent's apartment. Chaney then went home, but defendant and Williams continued their search for decedent. When the two reached Hamilton Park, the decedent and two other boys were just emerging from a fieldhouse. Williams and defendant approached decedent, and defendant told decedent's two companions to go on home. Decedent was told by defendant to remain, whereupon decedent began to cry. Defendant admonished decedent not to cry or he would be shot, but thereafter told decedent he was just playing and wiped decedent's tears. At this juncture defendant noticed that one of decedent's companions who had been told to go on home had not left, but had stopped near a snowbank. Defendant struck this boy and told him to go home. Thereupon defendant, decedent and Williams proceeded to decedent's house. On the way, they met two girls with whom defendant exchanged greetings. When the three got to decedent's apartment, decedent opened the door with a key, no one else being there, and the three boys went into the livingroom. Defendant told decedent to sit down, and asked him if he had any money or guns. Williams went into the kitchen and found a book of matches, which he placed in his pocket. Thereupon defendant handed Williams the gun in question and apparently commenced a search of the kitchen. Williams held the gun on decedent. When defendant emerged from the kitchen, he announced that he had found nothing, and told decedent to go into the bedroom. Decedent went into the bedroom, and pursuant to the directive of defendant, reclined upon the bed. Defendant then told decedent "You ain't going to

squeal no more," and directed that Williams cut the electrical wires from a lamp. Williams did so, and decedent's hands and feet were tied therewith. Williams also "gagged" decedent. Defendant then fired one shot at decedent, missing him. Defendant fired again, hitting decedent in the left temple. Blood started pouring from decedent's head. Defendant then told Williams to go see if anyone was coming, which he did. After ascertaining that no one was around, Williams said "let's get out of here," but defendant indicated that something more had to be done. Defendant set decedent's clothes afire, and Williams set the bed afire. The two then left the decedent's apartment and went to defendant's home. When they got there, they displayed the gun in question to defendant's brother. Williams and defendant left defendant's home shortly, when defendant's mother came home, and Williams hid the gun in his courtyard. The gun was left there overnight, and the next day Williams gave it, along with another gun, to one Ralph McCann.

Daryl Chaney, insofar as he observed Williams's and defendant's activities on the day in question, substantially corroborated Williams's testimony, although, the defendant maintains, there are some discrepancies.

Ralph McCann testified that on February 8, 1967, he received a gun from Williams which looked like the one introduced by the State. He hid the gun under the stairs of his house, but some time during the next day, he gave the gun to one Kenneth Brock, also known as Kenneth Davis. Davis testified that on February 9, 1967, after a conversation with McCann, he found a gun in the back of the latter's house and took it home. He kept the gun for a day and then threw it out the window into a snowbank. Leon Duminie, a youth officer for the Chicago Police Department, identified the gun earlier identified by Williams as the one he (Duminie) found in a snowbank underneath the bedroom of Kenneth Brock.

Other witnesses further corroborated Williams's testi-

mony in several significant aspects. Thus Herbert Roberts testified that he, decedent, and one Ronald Love, were in Hamilton Park on February 7, 1967, after gym class, when defendant and another boy stopped decedent and told Roberts and Love to go ahead. Roberts stopped by a mound of snow to wait for decedent, but was again told to go home. He saw defendant, decedent, and the other boy leave the park together. Roberts was not sure of the date of this occurrence but he never again saw decedent alive. Ronald Love testified that on February 7, 1967, he, decedent, and one "Herman" were in Hamilton Park after gym class, when defendant and another boy stopped them. Love was told to go home, but he saw defendant, decedent and the other boy walking together shortly thereafter. Regina Hoskins testified that on the afternoon of February 7, 1967, she and a girlfriend saw defendant, decedent, and a boy named "jap" (Larry Williams's nickname). Defendant said "hi" to the girls.

Thomas Looney, a Chicago fireman, stated at the trial that at about 6:00 P.M. on the day of the crime he answered a fire alarm at 7146 South Lowe (decedent's apartment building). The firemen entered a rear apartment and found a burning mattress. After the mattress was removed and the room cleared of smoke they observed a boy lying on the floor. He was burned from the waist down, and was bound and gagged. It was stipulated that decedent's mother would testify that decedent was alive and in good health on the morning of February 7, 1967, and that decedent's aunt identified decedent's remains at the morgue on February 8, 1967. Decedent was 12 years old at the time of his death.

Defendant's defense was that of alibi. His witnesses, composed of relatives and friends, several of whom, like those who testified for the State, were children, stated that during the apparent time of the commission of the offense, defendant was at home with his family and friends. A friend of defendant, Floyd Wimberly, testified that he spent

the day of February 7, 1967, with defendant and gave an account of the day's activities. Defendant testified in his own behalf, and his testimony was largely consistent with that of the rest of the defense witnesses. While the testimony of each of the defense witnesses does not dovetail with the testimony of each of the others with machinelike precision, we believe it fair to say that the alibi witnesses' respective narratives were largely consistent with each other. In this connection, however, it was brought out by the State that most of the defense witnesses had, prior to the trial, discussed their prospective testimony in the presence of defense counsel and each other.

Another witness called by the defense was Mrs. Perlene Rhone, who testified that she lived in the same building as decedent right across the hall from his apartment. She saw two boys enter the decedent's apartment at about 2 :00 P.M. on February 7, 1967, but she paid no particular attention to them and could not identify them. She further observed three boys enter decedent's apartment at 3 :00 P.M. on the same day. She saw decedent unlocking his door, and two other boys standing behind him. She testified that she could not identify the other two boys, although a police report introduced in evidence by the defense, with no objection from the State, asserted that she and one Ruth Taylor, another occupant of decedent's building, viewed defendant and some other boys shortly after the commission of the offense and indicated that defendant was not one of decedent's companions who had entered his apartment with him. In this connection, the report states that Mrs. Taylor said that she observed decedent and two young companions enter the Richardson apartment at about 3 :30 P.M. on the day of the crime and indicated to the police that she would be able to recognize decedent's companions if she were to see them again. Mrs. Taylor did not testify during defendant's trial.

Defendant initially maintains that the trial court should have, *sua sponte*, conducted a hearing on his competency.

No request for such a hearing was made by the defense. However, in support of this contention, it is urged that a *bona fide* doubt of defendant's competency is made manifest by the record and should have been recognized by the trial judge. Thus it is said that the brutality of the crime, defendant's below-average intelligence, the showing that defendant had once been detained by the police for sniffing glue, that he had once been involved in an arson attempt, that his teachers stated he appeared to be under the influence of drugs, his excessive absences from school, and his apparent ignorance of the concept of a jury trial all militate heavily in favor of the existence of a doubt as to defendant's competency. Under section 104—2 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1967, ch. 38, par. 104—2), the following is provided: "(a) If * * * after a judgment has been entered but before pronouncement of sentence * * * the court has reason to believe that the defendant is incompetent the court shall suspend the proceedings and shall impanel a jury to determine the defendant's competency. * * * (b) If during the trial the court has reason to believe that the defendant is incompetent the court shall suspend the proceedings and shall conduct a hearing to determine the defendant's competency * * *."

In *Withers v. People,* 23 Ill.2d 131, this court observed that "The test to be applied in determining whether a defendant has the mental capacity to stand trial is whether he understands the nature and object of the charges against him and can, in co-operation with his counsel, conduct his defense in a rational and reasonable manner. [Citations.] If the defendant does understand the nature and object of the charges against him and can, in co-operation with his counsel, conduct his defense in a rational and reasonable manner, then he is mentally competent to stand trial although upon other subjects his mind may be unsound." (23 Ill.2d at 135; see also Ill. Rev. Stat. 1967, ch. 38, par. 104—

1.) The record in this case does not, in our judgment, raise a *bona fide* doubt of defendant's competency under the foregoing principles. While a defendant may possess a sociopathic personality and suffer from psychiatric and social disturbances, these circumstances, without more, are not sufficient to raise a *bona fide* doubt as to his competency. (See *People* v. *Darby*, 36 Ill.2d 616.) What we are here interested in is whether doubt existed as to defendant's ability to understand the charges against him, which, the record establishes, he clearly comprehended, and whether he was able to co-operate with his counsel in connection with the presentation of his defense. While it is true that at the outset of the proceedings he manifested a lack of comprehension of the trial by jury concept, the trial court explained a jury's function to him in detail, and when it became apparent that the defendant did not yet understand, the court suggested that defense counsel and defendant's parents further explain the matter to him. After an off-the-record conference among defendant, his counsel and his parents, defense counsel informed the judge that defendant understood what was meant by a jury waiver, and that he did not want twelve men to hear his case, but rather he wanted the judge to hear it. There is no contention here that defendant did not knowingly and intelligently waive a jury, and we do not believe that the initial manifestation of defendant's lack of understanding of the meaning of a jury trial of itself can be deemed to have raised a *bona fide* doubt of his competency to stand trial. That no such doubt was apparent is further substantiated by a perusal of defendant's trial testimony. His answers to questions propounded by counsel, which were rational and orderly, do not at all indicate a lack of capacity to understand the nature of the charge against him or to co-operate with his counsel in connection with his defense. Further, the record of defendant's presentence investigation does not in the least suggest incompetency. Thus, although his

school attendance record was poor, his grades at Hinton School had been fair, he did not disrupt classes, he worked a newspaper route which was given up only at his father's insistence, he played little-league baseball, and no manifestations of emotional or psychiatric disturbances were noted in defendant's past history. Under all of the circumstances, we believe the trial judge did not err in failing to conduct, on his own motion, a hearing on defendant's competency. See *People* v. *Shrake,* 25 Ill.2d 141.

We now reach defendant's assertion that he was not proved guilty beyond a reasonable doubt. In this regard, both defendant and the State have pointed out in their respective briefs that there are numerous minor inconsistencies in the testimony of each side's witnesses when any one witness's testimony is compared to that of another on the same matter. It is further pointed out by both briefs that the record supports the inference that some of the witnesses on both sides were not disinterested or unbiased with regard to the outcome of the trial. However, it is clear that if the State's witnesses were believed by the trial judge, as was of course the case, the evidence on the issue of guilt was unquestionably legally sufficient to convict. The trial judge, who heard the witnesses' testimony and observed its delivery, was certainly not obligated to believe defendant's alibi evidence (*People* v. *Ault,* 28 Ill.2d 34, 36), and we have heretofore held that where, as here, the evidence is irreconcilably conflicting, it is the peculiar prerogative of the trier of fact, in this case the trial judge, to ascertain the truth. (See *People* v. *Goodpaster,* 35 Ill.2d 478, *cert.* denied 386 U.S. 967, 18 L. Ed. 2d 120, 87 S. Ct. 1051; *People* v. *Carpenter,* 28 Ill.2d 116.) After carefully reviewing the entire record, we are unable to conclude that the State failed to prove its case beyond a reasonable doubt, if its witnesses' testimony was credible. In this connection, defendant assails the testimony of Larry Williams, upon which, as we have seen, the State's case principally rested, as inherently

unbelievable. Thus it is suggested that the witness, an admitted accomplice in the commission of the offense, may have had ample reason to prevaricate. However, the record establishes that at the time of his testimony, Williams had already been committed to the Illinois Youth Commission for his participation in the crime and there is nothing whatever in the record which suggests that the State promised leniency to Williams in return for his testimony. Further, defendant's assertion at the trial that Williams's testimony was the result of police coercion after their arrests stands wholly refuted by the testimony of the guard at the Audy Home to whom, according to the defendant, Williams admitted that he was lying about defendant's participation in the crime because he had been beaten by the police, who coerced him into implicating defendant. The guard in question testified that he had never had any conversation whatsoever with either Williams or the defendant. Defendant further attacks the credibility of Williams's testimony on the ground that, according thereto, the decedent was shot only once, whereas it was established at the trial that three bullets were found in the decedent's head. Williams's assertion that defendant's first shot at decedent missed its mark may well have been mistaken, and a perusal of Williams's further testimony as to the actual commission of the offense supports the conclusion that Williams was not immediately present in decedent's bedroom at all times with defendant. Thus decedent may well have been shot again, unbeknownst to Williams. This court has earlier held that "The uncorroborated testimony of an accomplice, if it convinces the trier of fact beyond a reasonable doubt, is sufficient to sustain a conviction. (*People* v. *Nitti,* 8 Ill.2d 136; *People* v. *Alexander,* 21 Ill.2d 347.)" (*People* v. *Mullins,* 28 Ill.2d 412, 414.) We believe the record establishes that Williams's detailed testimony was largely consistent with the established, undisputed objective facts, and moreover, as heretofore shown, it was corroborated in significant detail by

other witnesses. Such testimony, in our judgment, was sufficient to establish defendant's guilt.

Accordingly, the judgment of the circuit court of Cook County must be and therefore is affirmed.

*Judgment affirmed.*