THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT LAHORI, Defendant-Appellant.

(No. 55958; ▮▮▮▮▮▮▮▮▮

First District (5th Division)—July 13, 1973.

Gerald W. Getty, Public Defender, of Chicago, (Jean Essary, Stanley Sacks, and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Mark Harms, Elmer C. Kissane, and Robert J. Cohen, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

OFFENSES CHARGED

Two counts of murder, under different paragraphs of the statute, for the killing of his wife. Ill. Rev. Stat. 1969, ch. 38, pars. 9—1(a)(1) and (2).

JUDGMENT

After a jury trial, defendant was found guilty of murder and was sentenced to a term of not less than 20 nor more than 30 years.

CONTENTIONS RAISED ON APPEAL

1. Defendant was not proved guilty beyond a reasonable doubt.

2. The trial court erred in refusing to give a self-defense instruction

to the jury, thereby depriving defendant of his right to have the jury instructed on the theory of his defense.

EVIDENCE

Eleanor Taylor, for the State:

She is the sister of the deceased, Barbara Lahori. As of April 26, 1970, she, Barbara, and Barbara's eight children (one of them being in California at the time), were living together in a three-bedroom apartment at 4632 S. Michigan, Chicago, Illinois. At 7:25 P.M., on that date, she, her sister, and the five-month-old baby were in the apartment when defendant arrived. She and her sister were in the kitchen, and defendant joined them there. Defendant was wearing an unbuttoned outer coat, and she could see his shirt and pants. She did not see a gun on his person at the time he entered the apartment, nor did she see him pick up a gun while in the apartment. After a few minutes, she went into her bedroom to iron a blouse. She did not have an ironing board, but was ironing on the mattress of her bed. A few minutes later, defendant went into her sister's bedroom, and her sister followed him. Defendant did not force Barbara into the bedroom. Her sister did not have a broom with her at the time. The witness' bedroom was separated from her sister's bedroom by a three- or four-foot-wide hallway, the two doors of the bedrooms almost directly across from one another. She was not facing her bedroom door while ironing, and could not look directly into the other bedroom, but turned around a few times to watch defendant and her sister.

Defendant and Barbara were together in Barbara's bedroom about five minutes when she heard her sister say, "Don't lay down, Robert, go home. I don't want to be bothered with you." She saw defendant pull a gun out of his left-side pocket. Then she heard shots, and turned around and saw Barbara stagger out of the bedroom into the hall. Her sister fell in the hallway about three feet from the living room with her head facing the living room. Defendant came into the witness' bedroom and pointed a gun at her. She pushed him against the wall; he said he wasn't going to shoot her; she kept telling him to drop the gun, which he did. She then ran downstairs to a neighbor's apartment to call the police. She was still in the neighbor's apartment when the police arrived about 10 minutes later and went upstairs. She followed them and heard defendant tell the officers that he had shot his wife.

Rosmond Howard, for the State:

He is a Chicago police officer. On April 26, 1970, at about 7:30 P.M., he and his partner went to an apartment at 4632 S. Michigan. He knocked on the door, and when defendant opened the door, he could see a revolver sticking in his belt. The witness took the gun with no resistance on defendant's part, and defendant said to him, "I shot my wife."

He walked into the apartment and observed the deceased lying in the hallway between the bedroom door and the living room door, with her head facing the living room. He examined the entire apartment, noticing only two bedrooms, one on each side of a hallway. He did not see a broom, an iron, or any signs of a scuffle in either of the bedrooms.

The gun retrieved from defendant was a blue-steel .32-caliber H & R or Rohm revolver containing four spent and two live cartridges. He unloaded the gun and later inventoried both the shells and the gun, sending them to the crime laboratory. He also found one spent bullet lying on the bed in the deceased's bedroom which he sent to the crime laboratory.

He later examined the body of the deceased at the hospital and observed five wounds, all on the left side of the body.

STIPULATION

The Coroner's pathologist would testify if called, that his examination of the body of the deceased revealed five bullet wounds, with death resulting from a bullet wound of the heart. The four bullets found in the body were placed in a coroner's envelope and sent to the Police Crime Laboratory.

Vincent J. Lomoro, for the State:

He is a police officer working in the Police Crime Laboratory. On April 28, 1970, he received from Officer Howard a .32-caliber Harrington & Richardson revolver, four discharged cartridge cases, and one fired .32-caliber bullet. On that same date, he received a sealed coroner's envelope containing three fired .32-caliber bullets. After test firing the weapon, he concluded that one of the bullets recovered from the body of the deceased had been fired from the weapon taken from defendant. The other spent bullets did not have suitable amounts of individual characteristics for an identification to be made.

Ernestine K. Hambrick, for the defense:

She is a medical doctor employed on the house staff of Cook County Hospital. Defendant was a patient at that hospital on two separate occasions, the most recent one being in January, 1969. Defendant had received a gunshot wound to his abdomen and was in the hospital for a colostomy closure. Defendant underwent surgery, and the colostomy was closed, but the bullet was not removed. Assuming that the bullet had not been surgically removed subsequent to January, 1969, the bullet would still be in the upper left quadrant of his abdomen.

Robert Lahori, defendant, in his own behalf:

On April 26, 1970, at about 7:00 P.M., he stopped at his wife's apartment to pick up a gun he had left there. His wife was the only person he saw in the apartment when he first arrived. He went into the kitchen, took his gun and holster out of a cabinet, and clamped them inside his

pants on the right side. He then walked into the living room where his wife was sweeping the carpet with a wood-handled broom. Defendant spoke to his wife about the unkempt appearance of the children and the apartment, and after a few minutes' conversation, she hit him in the stomach with the point of the broom, hit him several times on the head, scratched him, and bit his thumb. While trying to wrestle the broom from her hands, he was knocked to the couch. At that point, he must have passed out, because he does not remember any other details until he woke up on the couch with his gun in his hand and saw his wife lying face up on the floor in the living room with her head facing the hallway. He did not notice any blood or bullet holes on the body or clothing of the deceased, and he thought that she had merely been sick and fainted, as had happened before. The broom was on the living room floor, and he picked it up and leaned it against the wall in the hallway. He then walked to the back of the apartment, saw his wife's sister, Eleanor Taylor, and asked her to call the police. Eleanor had not been ironing when he saw her in the bedroom. Defendant then returned to the living room and tried to revive the deceased with mouth-to-mouth resuscitation. He continued to do so until the police arrived. It was when he picked up the body of the deceased to try to revive her that he noticed the blood. He did not move the body from the place he had first seen it. He let the police into the apartment and told the officers that he had shot his wife. Although he does not remember shooting his wife, that was the only thing he knew to say.

The officers took him to the hospital where he was treated for the bite and scratches and given pills for the pain. He was then taken to the police station and jailed.

In January, 1969, he received a gunshot wound to his abdomen. Although the colostomy was surgically closed, he still carried the bullet in his stomach and was often in pain. He was a patient at the Fantis Clinic and was given medication for the pain. He had been married to the deceased at the time he received the gunshot wound, and she knew the location of the wound and the fact that he was often in pain because the bullet was still in his stomach. When his wife attacked him with the broom, she hit the exact spot of the wound, and he experienced great pain in both his stomach and his side.

OPINION

There can be no doubt from the evidence that the deceased was killed by a bullet fired from the gun taken from defendant a short time after the incident. Defendant does not deny that he shot his wife, but contends that because he was the only eyewitness to the entire incident and his testimony was unrebutted by the State as to any material part, the State

failed to prove beyond a reasonable doubt that his shooting of the deceased was anything other than an action in self-defense.

■■ We find that the evidence adduced at trial was sufficient to sustain a murder conviction. Defendant's testimony, even if unrebutted, need not be believed by the trier of fact. (*People v. Wilkes*, 2 Ill.App.3d 626, 276 N.E.2d 761; *People v. Herron*, 125 Ill.App.2d 18, 260 N.E.2d 428.) However, in the instant case, defendant's testimony was contradicted by the State's witness, Eleanor Taylor. Although Miss Taylor did not actually observe the incident, she testified that she saw defendant and the deceased go into a bedroom, saw defendant pull a gun out of his pocket, heard shots, saw the deceased stagger into the hallway and fall with her head facing the living room, and was confronted in her bedroom by defendant who had a gun in his hand. Her testimony was corroborated by that of Officer Howard who stated that he found the body of the deceased in the hallway with her head facing the living room, whereas defendant testified that the body of deceased was in the living room with her head facing the hallway and that he did not move her from that spot.

■■ Although defendant testified that the deceased had attacked him and that he did not remember shooting her, the testimony of Miss Taylor was sufficient, if credible and believed, to warrant a conviction of murder. It is well established that it is the function of the jury to weigh contradictory testimony, judge the credibility of witnesses, and determine factual controversies. (*People v. Nicholls*, 42 Ill.2d 91, 245 N.E.2d 771, U.S. cert. denied 396 U.S. 1016, 90 S.Ct. 578.) Since the jury verdict is not so unsatisfactory as to justify a reasonable doubt as to defendant's guilt, it is beyond our function to set it aside. *People v. Peto*, 38 Ill.2d 45, 230 N.E.2d 236.

Defendant also urges that it was error for the trial judge to refuse to instruct the jury on self-defense, based on his testimony that although he does not remember shooting the deceased, he does remember her hitting, scratching, and biting him, and that if he did shoot her, he would have been acting in self-defense.

■■ We cannot agree with this contention. Section 7—1 of the Illinois Criminal Code (Ill. Rev. Stat. 1969, ch. 38, par. 7—1), provides that "a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself * * *." Raising the issue of self-defense requires as its sine qua non that defendant had admitted the killing as the basis for a reasonable belief that the exertion of such force was necessary. In *People v. Tanthorey*, 404 Ill. 520, 89 N.E.2d 403, the Supreme Court affirmed the decision of

the trial court in refusing to give tendered jury instructions on self-defense where defendant claimed that the shooting was accidental and that he was unaware that he had shot the deceased. In the instant case, defendant's testimony was that he could not remember whether or not he had shot the deceased because he had blacked out before the deceased was shot. Such a claim is inconsistent with a proper claim of self-defense bottomed on the statute quoted above in this paragraph. Since no legally satisfactory evidence was presented by defendant which could have been the basis for the giving of a self-defense instruction, it was not error for the trial court to refuse defendant's tendered self-defense instruction. *People v. Dukes*, 19 Ill.2d 532, 169 N.E.2d 84, U.S. cert. denied 365 U.S. 830, 81 S.Ct. 716.

■■ However, pursuant to Supreme Court Rule 615 (Ill. Rev. Stat. 1971, ch. 110A, par. 615), this court has the authority to reduce defendant's sentence. Consistent with what we understand to be the indicated policy of sentencing under the currently effective Illinois Code of Corrections (Ill. Rev. Stat. 1971, ch. 38, par. 1005—8—1), we reduce the minimum of defendant's sentence to 14 years so as to produce a greater spread between the minimum (which cannot be less than 14 years for a murder conviction) and the maximum imposed by the trial court.

Defendant's sentence is therefore modified to not less than 14 nor more than 30 years and, as modified, it is affirmed.

Affirmed as modified.

DRUCKER, P. J., and LORENZ, J., concur.