THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANDREW WEATHERS, Defendant-Appellant.

(No. 57978;

First District (4th Division)—March 13, 1974.

Charlotte Adelman, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Linda West Conley, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

Andrew Weathers, the defendant, was charged by indictments with murder, attempted robbery and three counts of armed robbery. Following a jury trial he was found guilty of murder, attempt and two counts of armed robbery. He was sentenced to serve not less than 40 nor more than 80 years in the penitentiary on the murder charge, and he instituted the present appeal.

On appeal he contends that (1) his arrest was improper, (2) his oral and written statements, made while in the custody of the police, should have been suppressed, (3) the statement of an alleged co-participant in the offense should not have been read to the jury, (4) the State concealed evidence favorable to his defense, (5) the court improperly refused to submit jury instructions concerning involuntary manslaughter and reck-

less conduct, (6) he was not proven guilty beyond a reasonable doubt, and (7) his sentence is excessive.

We summarize the evidence. On May 1, 1971, at about 2 o'clock in the morning, Willie Johnson drove his automobile into the rear of a gas station located at Lexington Street and California Avenue. He got out of the car to go to the rest room. P. L. Johnson and Ernest Douglas remained in the front seat, and Herman Milton was asleep in the rear. While Johnson was outside of the car he saw two negro men run up. One was skinny and the other "kind of heavy." The skinny one said, "I want your money." When Johnson said that he had no money, the skinny one searched him and took some money out of his inside pocket. After this he heard a shot and the robbers fled.

P. L. Johnson, also known as Frank Johnson, testified that he saw two men go through Willie Johnson's pockets. One of the men was very small and the other one was "pretty heavy." After the two had robbed Willie Johnson, the heavy man (the defendant) entered the front seat and took his money and a gold watch. The defendant then got out of the car and stood beside it along with the other man. He reached into the back seat and touched Milton on the knee. Milton said, "No man, don't do that to me" and went back to sleep. The defendant rolled down the rear window and said to Milton, "Man, if you don't give me that money out of there I will kill you. I will blow your head off." At this time the defendant was holding a sawed-off shotgun. Johnson heard two blasts, and the robbers fled. He looked into the back seat and saw Milton slumped over with a wound in his neck. He identified a gold watch in evidence as being the watch taken from him and also identified a shotgun as being similar to the one used to shoot Milton.

King Ward testified as a witness for the State. He stated that he was a friend of the defendant, who was also known as "Casino", and had known him all his life. He was reluctant to testify against the defendant, but did so because he was subpoenaed. He related that there was a small party in the defendant's apartment on the evening of April 30. Everyone there was drinking. The defendant showed him three pieces of a shotgun and asked him to put it together, which he did. The defendant asked him for some shotgun shells, but he told the defendant that he did not have any. However, someone else at the party stated that he had some.

At about 2 o'clock in the morning, the defendant left the apartment with Tyrone Hughes and a girl named Renee. The three of them returned at about 3 o'clock, and the defendant gave Ward the shotgun, which was again in three pieces. Ward asked the defendant about the shells, and the defendant said that he had thrown them away. The defendant had borrowed Ward's jacket, and he returned it along with the

gun. Ward gave the gun to James Clemmons, also known as "Sug", and later the same day (May 1) went to Clemmons' apartment along with the police to recover the weapon. He was also present when the police recovered a gold watch from the pocket of the jacket that he had loaned to the defendant.

Renee Fox, who was 16 years old, testified for the prosecution. She stated that she and the defendant left the party along with Tyrone Hughes, and the three of them "drove around" in a red and black Dodge Charger driven by Tyrone. They stopped near Lexington and California, and the two men got out. She fell asleep, but was awakened by gun shots. Hughes and the defendant returned, and they went back to the defendant's apartment where the defendant gave a rifle to King Ward.

The police arrived at the scene of the shooting, and it was ascertained that Milton was dead. Doctor Jerry Kearns, a pathologist, testified that he conducted an autopsy on Milton's body, and that Milton died of a gunshot wound in the neck and skull. The police investigation led ultimately to the defendant and Tyrone Hughes, and they were arrested. At first the defendant denied any knowledge of the offense, but later he admitted participation in the robbery. He denied, however, that he and Hughes had intended to shoot anyone and stated that the gun went off accidentally as he was attempting to take it away from Hughes.

We begin by considering whether the defendant's arrest was improper. He argues that the officers had no warrant and had no reasonable grounds to believe that he had committed a crime and therefore that his arrest should have been quashed. It is undisputed that the officers did not have a warrant. However, the State contends that the prior police investigation established sufficient probable cause to arrest the defendant. After reviewing the record, we agree.

Officer Kenneth Spink testified that he arrived at the scene of the shooting prior to the removal of Milton's body. He interviewed Milton's companions and other persons on the scene. A witness, Miriam McGee, informed him that the car driven by the offenders was a red and black Dodge Charger, and he passed this information along to Officers Thomas Sherry and James Griffin, who were assigned to investigate the incident at 8:30 that morning.

Sherry and Griffin both testified that they spoke with Officer Niebalic and were informed that he had issued a traffic ticket to the driver of a red and black 1969 Dodge Charger at 2:45 A.M. at a location 1 or 2 miles from the gas station. The ticket identified the driver as Tyrone Hughes of 2212 West Flournoy Street and listed the license plate number of the car as PE4697. The officers returned to the area of the gas station and interviewed Miriam McGee, who stated that she had memor-

ized the license number of the car that she had seen and that it was PE4697.

Sherry and Griffin went to 2212 West Flournoy, where they were joined by Officer Soil. They spoke to Mrs. Neeley, who stated that she was Tyrone's mother. She told them that her son was known as "Jap". She also told them that her stepson, John McChristian, had a red and black 1969 Dodge Charger. They spoke to Tyrone's brother, Edward Hughes, who told them that Tyrone and a person named "Casino" had been in possession of the car between 1 and 3 o'clock in the morning. He also told them that he did not know Casino's real name, but that Tyrone could probably be found either at a nearby pool room or at Casino's apartment, which was located at 1815 West Monroe Street.

The officers had been given a description of Hughes by his brother. They also had obtained a general description of the offenders from the victims and had learned that one of the offenders had probably been hit in the jaw by the shotgun when it went off. They went to the pool room, but did not find either Hughes or Casino. They then proceeded to 1815 West Monroe, where they ascertained the number of Casino's apartment by asking a boy who lived in the building. There is a conflict in the testimony as to the manner in which the officers gained entry to the apartment; however, it is immaterial to the question of probable cause. Once inside, they saw several men engaged in washing walls. They stated that they were looking for Tyrone Hughes and Casino, and the occupants denied that either was present.

Officer Soil noticed that one of the men had high cheek bones and asked him if he was known as "Jap". He said no, and Soil asked him for identification. He stated first that his name was Tyrone Neely and then that it was Tyrone Hughes. Officer Griffin then noticed that Hughes had a bump on his jaw. Officer Sherry asked which person was Casino, and Hughes stated that it was the one with the red streak in his hair. The officers observed that the defendant had a red streak in his hair and asked both Hughes and the defendant to accompany them to the station.

■■ In our view the foregoing is sufficient to establish a reasonable belief on the part of the investigating officers that Hughes and the defendant had committed the robberies and shooting. As our supreme court has stated, "the test of probable cause is whether a reasonable and prudent man in possession of knowledge which has come to the arresting officer would believe the person to be guilty of the crime; that it is something less than evidence that would result in conviction and may be founded on hearsay evidence; that it is based upon factual and practical considerations of every day life upon which reasonable and prudent men, not legal technicians, act." (*People v. Macias* (1968), 39 Ill.2d 208,

213, 234 N.E.2d 783, 786-87.) If this test is applied to the information developed by the officers during their investigation, it is apparent that they had probable cause to arrest the defendant.

The defendant places great emphasis on the fact that some of the information about which the officers testified was not included in the police reports that they prepared shortly after the events allegedly occurred. This, he argues, discredits their testimony and creates a doubt as to the actual existence of the probable cause. While we might agree with this argument in principle, we believe that it raises a question of credibility, which the trial court resolved adversely to the defendant. As we have stated on numerous occasions, this court will not, except in cases of palpable error, substitute its judgment for that of the trial of fact in determining the credibility of witnesses.

■■ The defendant also argues that the circumstances presented no emergency, and therefore that it was improper for the officers to have proceeded without a warrant. We deem it now well settled in Illinois that the legality of arrests is to be tested by the presence or absence of probable cause and not the presence or absence of a warrant. (Ill. Rev. Stat. 1969, ch. 38, par. 107—2; *People v. Johnson* (1970), 45 Ill.2d 283, 259 N.E.2d 57.) We have already concluded that there was probable cause for the arrest, and therefore we consider this argument to be without merit. The trial court acted properly in denying the defendant's motion to quash the arrest.

As his second contention, the defendant asserts that the trial court erred in denying his motion to suppress the oral and written statements that he made while in police custody. He argues that they were the products of an illegal arrest and that they resulted from coercion. We have already commented on the legality of the arrest and need not comment further.

With respect to the allegation of coercion, the defendant testified that after being taken to the police station he was handcuffed to a radiator, placed in several lineups, interrogated continuously, denied food and beaten on the arm with a blackjack. He stated that he finally agreed to make a statement because he did not want to be "jumped on no more." A defense witness, Curtiss Terry, testified that he saw the defendant in a lineup and that the defendant had tears in his eyes and was having difficulty with one arm. The defendant told him that he had been beaten by the police. The defendant's mother testified that she visited the defendant in jail 2 weeks after his arrest, and he told her that he had been beaten on May 1. She noticed that something had happened to his hand. The defendant also reported to officials at the Cook County Jail that he had been injured.

This testimony was directly opposite that of the police officers present, who testified that the defendant was not beaten or abused in any way, that he was allowed to see friends and members of his family who came to the station and that he was given a sandwich and soft drink. The officers also stated that the defendant was advised of his constitutional rights on at least two occasions prior to making any statement, and he indicated that he understood them. He made both the oral and written statements voluntarily. This testimony was corroborated in part by the court reporter and assistant State's Attorney, who testified that they were present at the taking of the written statement and that the defendant appeared to be in good physical condition.

In our view, this conflicting evidence raised a question of fact to be determined by the trial court. Thus the matter is one of weighing evidence and judging the credibility of witnesses. After hearing the evidence, the trial court found that the events in question had transpired substantially in the manner described by the State's witnesses. We can find nothing in the record which would allow us to substitute our judgment for that of the trial court.

■■ The defendant also argues that the statements should have been suppressed because he made them as a result of being informed by the police that Tyrone Hughes and Renee Fox had made statements implicating him in the offense. The record reflects that the officers did tell the defendant that they possessed certain incriminating statements made by Hughes and Miss Fox. However, we can see no indication that this procedure was coercive and we do not believe that it provides a basis for suppressing the statements.

■■ Finally, the defendant argues that his motion to suppress should have been granted because the State failed to produce every person present at the time that the statements were taken. The record reflects that a police officer named Hensley, who was present when the defendant made his written statement, was not called to testify at the hearing on the motion to suppress. However, it does not appear that Officer Hensley was present when the alleged coercion took place or that his testimony would have differed from that of the other officers present, all of whom did testify. It was the burden of the State to prove by a preponderance of the evidence that the statements were voluntary. (Ill. Rev. Stat. 1969, ch. 38, par. 114—11.) After reviewing the totality of the evidence, we conclude that the State met this burden and that the trial court was correct in denying the motion to suppress.

As this third contention, the defendant urges that it was error for the court to have allowed the confession of Tyrone Hughes to be read to the jury. By this he refers to a portion of his own written statement which

contains a colloquy between himself, Hughes and a police officer in which Hughes states that the defendant was holding the gun when it went off and that he had the defendant by the arm. The defendant states that it was Hughes who had the gun and that he had Hughes by the arm. Both agree that they were wrestling over the gun at the time. This portion of the defendant's statement was admitted into evidence and read aloud to the jury over the objection of defense counsel.

■■ The defendant argues that Hughes' version of the shooting directly contradicts his and, therefore, under the holding of *Bruton v. United States* (1968), 391 U.S. 123, that portion of his statement which contained Hughes' remarks should not have been admitted. We have examined the statement, and we disagree with the defendant's characterization of Hughes' version of the incident as contradictory to his. If anything, it is corroborative in that it strengthens the defendant's theory that the shotgun discharged accidentally as he and Hughes struggled over it. The conflict as to who was actually holding the gun when it went off is immaterial, as the State, under its theory of the case, was not required to prove that the defendant had possession of the gun or actually pulled the trigger. (See Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a)(3); *People v. Brooks* (1972), 51 Ill.2d 156, 281 N.E.2d 326.) Even if it be assumed for the sake of argument that Hughes' statement was prejudicial to the defendant, its introduction was, at most, a harmless error in view of the overwhelming evidence of the defendant's guilt. See *People v. Lucas* (1971), 48 Ill.2d 158, 269 N.E.2d 285.

As his fourth contention, the defendant argues that the State deliberately concealed evidence favorable to the defense. The evidence to which he refers is the medical records of the Cook County Jail concerning treatment of an alleged injury on the defendant's arm. This contention is utterly unsupported by the record, as it appears that the State complied fully with defense counsel's discovery motion, and defense counsel acknowledged this fact in open court.

As his fifth contention, the defendant argues that the court erred in refusing to instruct the jury as to involuntary manslaughter and reckless conduct. He takes the position that the jury could have found from the evidence that he intended to leave the scene of the robbery prior to the shooting and that he returned only for the purpose of persuading Tyrone Hughes to leave. He bases this upon his testimony that he wanted to leave because people were coming and that he and Hughes were "playing with" the shotgun when it went off.

■■ We find this argument unpersuasive. It was the State's theory that the defendant was guilty of murder under the so-called "felony murder rule". (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a)(3).) This provides that

a person is guilty of murder if he kills an individual while attempting or committing a forcible felony. No intent is required, and the accused need not be the actual perpetrator of the killing. (*People v. Brooks* (1972), 51 Ill.2d 156, 281 N.E.2d 326.) It follows, then, that it would be impossible for one committing a homicide during the course of a forcible felony to be guilty of manslaughter. In the present case the defendant admitted participation in a planned armed robbery. Therefore, it would have been impossible for the jury to have found him guilty of manslaughter or reckless conduct, and any conjecture as to the precise circumstances under which the gun was discharged is immaterial. It is our conclusion that the trial court correctly refused the tendered instructions.

As his sixth contention, the defendant argues that he was not proven guilty beyond a reasonable doubt. He bases this contention upon his own testimony that he had ceased his participation in the robbery at the time of the shooting and that it was "accidental". He also questions the credibility of P. L. Johnson's testimony that he heard the defendant demand Milton's money because Johnson was drunk at the time of the robbery. As we have explained, under the theory of felony murder, the jury could have taken the defendant's version of the shooting as true and still have convicted him of murder. Furthermore, the jury was not required to believe the defendant or to give his testimony any weight at all. Therefore, the question is one of credibility of witnesses rather than reasonable doubt. For these reasons, we are satisfied that the record overwhelmingly supports the conviction.

■■ Finally, the defendant contends that his sentence is excessive. The trial court described the shooting as vicious and senseless. It was revealed at the hearing in aggravation and mitigation that the defendant had been convicted previously of battery and aggravated battery and was on probation at the time of the present offense. We have stated on numerous occasions that sentencing is within the sound discretion of the trial court and that in the absence of an abuse of such discretion this court will not intervene. We concur in the trial court's characterization of the offense, and we see nothing in the record that would indicate an abuse of the court's discretion.

For the foregoing reasons the judgment of the Circuit Court is affirmed.

Affirmed.

DIERINGER and JOHNSON, JJ., concur.