THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ALVIN ABRAMS, Defendant-Appellant.

Third District No. 81—546

Opinion filed October 6, 1982.—Rehearing denied November 16, 1982.

BARRY, P.J., specially concurring.

Robert Agostinelli and Thomas A. Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCOTT delivered the opinion of the court:

The defendant, Alvin Abrams, was convicted of murder, felony murder and armed robbery following a jury trial in Will County. He was thereafter sentenced to a term of 20 years' imprisonment on the felony murder conviction and a concurrent term of 10 years as a result of the armed robbery conviction. No sentence was imposed on the murder conviction.

On appeal, the defendant contends he was not proved guilty beyond a reasonable doubt, that the trial court erred in refusing to give certain tendered instructions, that the prosecutor made an improper and prejudicial closing argument and that the convictions for murder and armed robbery should be set aside as lesser included offenses of felony murder.

With respect to defendant's first issue raised on appeal, which challenged the sufficiency of the evidence to support his convictions, we note that the evidence at trial established the following sequence of events.

On Octrober 20, 1979, Edward Dorris, Jon Smith, George Norris and Walter Richardson were going to meet at an abandoned residence in Joliet, Illinois, where they regularly met to gamble. This particular evening the group was joined by a newcomer, the defendant.

Dorris arrived at the house approximately 9 p.m. Smith, Norris and defendant were already present. Defendant arrived with Norris in a light-colored station wagon. Defendant asked Dorris where the gambling was and when it would start. Dorris said that not everyone had arrived but that the game would start soon. Walter Richardson had not yet arrived. However, defendant was anxious to start and so they eventually went inside and began to gamble. Defendant and Smith started to shoot craps. Dorris ran the game while Norris just watched.

Smith and the defendant had been gambling for approximately 10 minutes when Richardson walked in. Richardson had driven to the house accompanied by Rosemary Durham, who remained in the vehicle. Eventually, Richardson asked Smith to let him gamble. After Smith let Richardson take his place at the table, Smith went out to the car and coaxed Durham to come inside. Richardson proceeded to shoot craps with the defendant.

Defendant and Richardson gambled for awhile with defendant

winning at first and then Richardson. According to Dorris, defendant ran out of money and he then reached into his pocket as if to get more money, but instead defendant brandished an automatic weapon. Smith had not been paying much attention to the game, but when he looked up, defendant was holding a 9mm Browning automatic handgun and pointing it at him. Defendant told them to raise their hands and to put their money and car keys on the table. Everyone complied with defendant's demand except for Norris. Defendant then specifically asked Smith, "Where are all your $100 bills?" Smith told him that he put all the money he had on the table. Defendant told Smith, "If I don't get them $100 bills, I am going to blow you away." Sometime after defendant had pulled the gun and the time that the shooting began, Norris told the defendant to "Hurry up, man!"

In searching Smith, defendant discovered two guns, a .25-caliber automatic and a .357 magnum. He took both guns from Smith. The .357 magnum was either in the defendant's hand or on the table in front of the defendant. After the guns had been taken from Smith, Richardson placed about $200 on the table. Overall, the witnesses estimated that about $300 to $400 had been placed on the table. Most of the money that was used to gamble with was in denominations of $5, $10 and $20 bills.

After the money had been placed on the table, according to Dorris, defendant was going to search him. Smith testified that defendant looked towards the door and when the defendant turned his attention away from Richardson, Richardson pulled a .25-caliber automatic pistol similar to the one that defendant had taken from Smith. Richardson directed an obscene remark to the defendant and then shot him at least three times. Just prior to the commencement of the shooting, Dorris and Durham began to run out of the room. After Richardson shot at defendant, Smith upended the table and ran out of the room. More shots were heard by Dorris and Smith after leaving the house. Based on the reports, Dorris testified that two different types of guns had been shot, one sounded louder than the other. Dorris then went to a neighbor that he knew in the vicinity and used the telephone to call the police. Smith ran out of the home, stopped and looked back and observed a long white car pull away. He had earlier seen it with defendant and Norris in it, but was unable to see who was in the vehicle at the time it was driven away.

Smith then returned to the house and reentered the room where the shooting occurred. He saw Richardson lying on the floor, checked his pulse and determined that he was dead. Smith found a .25-caliber automatic pistol lying on the windowsill. He did not know if it was

Richardson's or his. Smith took the gun and threw it in the woods to the east of the house. He later informed the police of what he had done, and although efforts were undertaken to recover the gun, it was never found.

Rosemary Durham also reentered the room and Smith told her that Richardson was dead. After throwing the gun into the woods, Smith took Durham to town in Richardson's car. Smith took Durham to town because he did not want her to become involved in the shooting. All of these events took place in about 20 minutes.

When Smith returned to the scene, he attempted to call the police from a home directly across the street; however, the police arrived as he was on the phone and he returned to the scene. When Dorris called the police, he told them that Norris had shot someone because he did not know the defendant's name.

After the police arrived certain physical evidence was recovered, including a projectile from a door jam just above the strike plate on the kitchen door and a .38-caliber spent projectile from the basement of the residence. Also recovered were six spent .25-caliber shell casings, a copper jacketed bullet from just inside the left leg of the victim, a nickle-plated 9mm Browning automatic pistol, some loose change and a wristwatch. Outside the home, officers recovered two $1 bills and some broken car glass with blood on it.

An autopsy revealed that the decedent, Richardson, died of multiple gunshot wounds and three .38-caliber projectiles were removed from the victim's body.

A forensic scientist testified that all of the .38-caliber spent projectiles from the residence and the decedent's body could have been fired from the same gun. Ballistic tests further revealed that the .38-caliber projectiles had not been fired from the 9mm Browning automatic initially possessed by the defendant.

The ballistics expert further testified that many types of firearms could fire a .38-caliber projectile. A weapon chamber for a .357 magnum cartridge (such as the weapon taken by defendant from Smith) can fire a variety of .38-caliber cartridges. A projectile fired from a .38-caliber and a projectile fired from a .357 magnum would exhibit similar characteristics.

A University of Chicago police officer who worked at the emergency room at Billings Hospital in Chicago, testified that on October 21, 1979, two men wheeled a third man into the emergency room. The officer was informed that the man in the wheelchair had been shot. After the man had been wheeled into the trauma room, his personal effects were inventoried and it was determined that the

wounded individual had $560 on him. The money was dirty and lumped together in a crumpled-up ball. The denominations consisted of $20's, $10's, $5's and two $1 bills. The officer also testified that he recognized a photograph of George Norris as the heavyset individual, who walked with a slight limp, as one of the men who wheeled the defendant into the emergency room.

The Chicago Police Department conducted a preliminary investigation at Billings Hospital into the shooting of defendant. The defendant was asked who shot him, and made no reply. The defendant was asked if a man shot him, and the defendant said "No." The defendant was then asked if defendant was shot by a woman, and defendant replied "Yes." Defendant would say nothing more to the police at that time.

The Chicago Police Department did a follow-up investigation later on the afternoon of October 21, 1979. An officer spoke with the defendant while the latter was in X ray. Defendant stated that he was shot at 63d and Cottage Grove in Chicago and that he did not know who shot him. The officer asked if it was a woman and defendant replied that he did not know. Defendant then told the officer that he was tired and did not want to talk any more.

When the defendant was served with an arrest warrant in the hospital he denied any knowledge of the alleged shooting incident. Later, during transit from the Cook County jail to the Will County jail, the defendant stated "I don't know why I'm being charged with this when the other guy shot me three times and almost killed me."

Defendant claimed that after he caught Richardson switching dice (the switch came after the defendant had already lost $100), Richardson shot him three times. Although wounded, the defendant reached across the table and grabbed Richardson and struggled to get the gun. It was then that another person entered the room and fired three shots at the defendant. The defendant said that he shielded himself with Richardson's body and as a result, Richardson was killed. Defendant also claimed that since he checked into the hospital under his real name, such a fact necessarily proves that he was telling the truth.

Defendant levies numerous attacks on the People's evidence attempting to discredit it. He first focuses upon the credibility of Smith and Dorris, claiming that they were both disreputable characters. The basis of this assertion is that Smith and Dorris were engaged in criminal enterprises, including gambling, carrying concealed weapons, etc. We note that like Smith and Dorris, defendant was also engaged in the same criminal enterprises on the night of the instant occurrence:

gambling and illegally carrying a concealed weapon.

Defendant's argument that he was not proved guilty beyond a reasonable doubt is essentially the same argument which was presented to and considered by the jury, which by its verdict resolved such questions as conflicting evidence and the credibility of the witnesses in favor of the State. These ultimate issues are properly to be considered and weighed by a jury. *People v. Arndt* (1972), 50 Ill. 2d 390, 280 N.E.2d 230.

In cases where the evidence is irreconcilably conflicting, it is the peculiar prerogative of the trier of fact to ascertain the truth. (*People v. Hammond* (1970), 45 Ill. 2d 269, 259 N.E.2d 44.) Thus, the trier of fact is not bound to believe testimony of the defendant as against the State's evidence in a case where the evidence is conflicting. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) When a trier of fact renders a decision based upon credible and substantial evidence, which we believe was sufficient here to support the conviction, the verdict may not be lightly set aside merely because the trier of fact chose to believe the testimony presented by the State rather than that presented by the defendant. *People v. Martinez* (1978), 62 Ill. App. 3d 7, 377 N.E.2d 1222; *People v. Slaughter* (1980), 84 Ill. App. 3d 1103, 405 N.E.2d 1295.

The defendant's second issue raised on appeal concerns the propriety of the trial court's decision not to give defendant's tendered instruction on self-defense to the jury. The jury was instructed on self-defense, however, when IPI Criminal Jury Instruction No. 24.06 was read to them as follows:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or the commission of a forcible felony." Illinois Pattern Instruction, Criminal, No. 24.06 (1968) (hereinafter cited as IPI Criminal).

Defendant argues that the issues instructions on murder (IPI Criminal No. 7.02) should have been adapted in accordance with IPI Criminal No. 25.05 and that the phrase "without legal justification" should have been added to IPI Criminal No. 7.01 for the definition of murder. IPI Criminal, at 435-36.

The People contend that despite the fact that the prosecutor at trial submitted the self-defense instruction (IPI Criminal No. 24.06),

which was given without objection, no evidence of self-defense was ever presented. Such a claim is based upon their analysis that since the defendant's version of the killing included the defendant using the murder victim as a shield from shots fired from an alleged unknown assailant, the *sine qua non*, the defendant's admission of the killing as the basis for a reasonable belief that the exertion of such force was necessary, was never presented. *People v. Tanthorey* (1949), 404 Ill. 520, 89 N.E.2d 403; *People v. Lahori* (1973), 13 Ill. App. 3d 572, 300 N.E.2d 761.

 █ While we believe such a theory propounded by the State is indeed a novel approach to the subject of the availability of self-defense, we are inclined to reject its application at least to the case at bar. We believe that the issues instruction defining the offense of murder should have included the question of "legal justification" since the defendant's version of the victim's killing constituted some evidence of self-defense. (*People v. Sunquist* (1977), 55 Ill. App. 3d 263, 370 N.E.2d 864; *People v. Wright* (1974), 24 Ill. App. 3d 536, 321 N.E.2d 52.) However, we note that defendant has also alleged, and we believe properly so, that despite the fact that no sentence was imposed as a result of his murder conviction, the conviction itself must be set aside in any event pursuant to the authority of *People v. Miller* (1980), 89 Ill. App. 3d 973, 412 N.E.2d 175 (supervisory order No. 54338 vacating conviction for murder while allowing felony murder conviction to stand). The issue therefore of whether the defendant was denied a fair trial on the charge of murder because of the alleged improper jury instruction would appear to be moot, if the conviction for murder is subsequently set aside. And since the claim of self-defense is not available to one who participates in a forcible felony (such as felony murder) (Ill. Rev. Stat. 1979, ch. 38, par. 7–4(a); *People v. Gates* (1977), 47 Ill. App. 3d 109, 361 N.E.2d 809), any error stemming from the failure to instruct the jury on the question of self-defense regarding the charge of murder could not have had any prejudicial effect or impact on the jury's deliberations with respect to the charges of felony murder and armed robbery.

The foregoing holding applies equally to the defendant's allegation that the trial court erred in refusing to give defendant's tendered instruction for voluntary manslaughter. While voluntary manslaughter is an included offense of murder (*People v. Pierce* (1972), 52 Ill. 2d 7, 284 N.E.2d 279), it is not an included offense of felony murder (*People v. Weathers* (1974), 18 Ill. App. 3d 338, 309 N.E.2d 795). Hence, even if it was error to refuse to give the defendant's tendered manslaughter instruction in connection with the murder charge, such er-

ror could not, as a matter of law, have affected the jury's deliberations regarding the felony murder and armed robbery charges.

The defendant also contends that the trial court erred in refusing to instruct the jury regarding an initial aggressor's use of force. (IPI Criminal No. 24.09.) Again, since we have agreed with defendant that his murder conviction must be set aside, and since a person is not justified in the use of force if he is committing a forcible felony (Ill. Rev. Stat. 1979, ch. 38, par. 7—4(a)), the defendant's tendered instruction would necessarily have been refused with regard to the charges of felony murder and armed robbery.

Defendant claims the prosecutor's closing and rebuttal arguments were improper and amounted to prejudicial error. Upon a review of the record, it is readily apparent that certain comments cited in the defendant's brief to support his prejudicial claim were not objected to at trial. Because the errors claimed by defendant have been claimed for the first time on appeal, the People submit that the defendant has waived any error in these various statements by failing to raise a timely objection.

The failure to make a timely objection to allegedly improper remarks of the prosecutor effects a waiver of the objection. *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.

Defendant attempts to salvage the matter by asserting that the cumulative effect of the comments was prejudicial and therefore should be considered as a matter of plain error. It is well settled that only when the remarks complained of result in substantial prejudice is reversal required. (*People v. Kitchen* (1977), 53 Ill. App. 3d 521, 368 N.E.2d 528.) Even though the court may relax the waiver rule, the case should not be reversed unless those portions of the closing argument of the prosecutor, which were not objected to a trial, were so prejudicial and inflammatory that they have deprived defendant of a fair trial and were a material factor in the guilty verdict of the jury. *People v. Simmons* (1974), 21 Ill. App. 3d 310, 315 N.E.2d 226.

■ The comments complained of did not distort the law or obscure the State's burden of proof in the minds of the jury. The comments were not so prejudicial and inflammatory that they deprived defendant of a fair trial, nor were the comments a material factor in the jury's guilty verdict. Moreover, defendant has not established any actual prejudice stemming from the prosecutor's comments now objected to for the first time on appeal. A general assertion of prejudice does not establish such a fact, but is nothing more than mere speculation in the absence of actual prejudice. (*People v. Walker* (1974), 24 Ill. App. 3d 421, 321 N.E.2d 114.) Hence, none of the comments were

so inflammatory or prejudicial as to deny defendant a fair trial. The prosecutor's argument does not therefore constitute plain error.

The first objection levied by defendant refers to a series of comments relating to the prosecutor's theory that George Norris was defendant's accomplice in the armed robbery. The four comments made were based on the testimony of Dorris and the reasonable inferences deducible therefrom. Thus, the comments were legitimate and proper argument. *People v. Hill* (1977), 45 Ill. App. 3d 14, 358 N.E.2d 1350; *People v. Butler* (1974), 21 Ill. App. 3d 331, 315 N.E.2d 144.

Of the four statements, only once did the prosecutor mention that Jon Smith testified about Norris' conduct. Although Smith never testified as argued by the prosecutor, such a minor misstatement could not have had much of an impact upon the jury. The comment was an isolated remark. Moreover, the underlying factual content of the statement was premised upon the evidence adduced at trial regardless of who stated it. As noted, the prosecutor's misstatement was not objected to by trial counsel. Furthermore, the jury was instructed that any statement made in closing argument by the attorneys which was not based on the evidence should be disregarded. Under the totality of the circumstances, no reversible error has occurred.

Defendant also complains about the prosecutor's rebuttal argument regarding certain spent cartridges found in Smith's vehicle. The defense argued that the cartridges found in Smith's car indicated that Smith may have been responsible for shooting Richardson. No evidence was presented linking the spent cartridges to the shots which killed Richardson. While there was no evidence to support the defense theory, the argument was presented anyway. The prosecutor, based upon reasonable inferences from the record, merely postulated a contrary theory explaining the presence of the cartridges in Smith's vehicle. The prosecutor's argument was made solely to rebut defense counsel's contentions. Hence, defendant invited the prosecutor's response and, accordingly, no error occurred. *People v. White* (1980), 88 Ill. App. 3d 788, 410 N.E.2d 1082; *People v. Hine* (1980), 88 Ill. App. 3d 671, 410 N.E.2d 1017; *People v. Dunning* (1980), 88 Ill. App. 3d 706, 410 N.E.2d 1052.

■ Defendant next argues that the prosecutor made inflammatory remarks during his closing argument when he referred to the racial composition of the men who were gambling. The People contend that the prosecutor was not attempting to appeal to the prejudices of the jury. The defense at trial dwelled at great length about the fact that Smith possessed two guns that evening. The prosecutor's argument was an apparent attempt to explain why Smith was carrying

these weapons on the night in question. The remarks, although referring to race and better left unsaid, were general in nature and were not a direct slur against the defendant designated to arouse the prejudice of the jury (which we note was composed of both white and black people). Moreover, defense counsel himself injected racial overtones into his closing argument. Accordingly, under the circumstances, no reversible error occurred as a result of the prosecutor's reference to race. *People v. Gary* (1976), 42 Ill. App. 3d 357, 356 N.E.2d 135.

Additionally, if any error resulted from the prosecutor's isolated reference to race, it was cured by the trial judge's sustainment of defense counsel's timely objection to the comment. *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

In reading the prosecutor's closing argument *in toto*, we believe that the prosecutor's argument was within the generally accepted bounds of legitimate and proper comment, and having arrived at this determination, it logically follows that there is no merit in defendant's assertion that the unobjected-to remarks of the prosecutor constituted plain error.

■ Finally, defendant contends that his convictions for murder and armed robbery must be vacated as lesser included offenses of felony murder. (*People v. Miller* (1980), 89 Ill. App. 3d 973, 412 N.E.2d 175 (supervisory order No. 54338 vacating conviction for murder while allowing felony murder conviction to stand); *People v. Devine* (1981), 98 Ill. App. 3d 914, 424 N.E.2d 823.) We agree.

For the foregoing reasons, the defendant's conviction and sentence for felony murder is affirmed, while his convictions for murder and armed robbery are reversed and the sentence for armed robbery is vacated.

Judgment affirmed in part, reversed in part.

ALLOY, J., concurs.

PRESIDING JUSTICE BARRY, specially concurring:
I concur with the majority opinion on the substantive issues generally.

On the instruction issue, I believe that the majority has properly found error in the trial court's failure to include the phrase "without legal justification" in the issues instruction on murder. I part company with the majority in its treatment of the instruction issue as "moot." I would, instead, find reversible error (*People v. Sunquist* (1977), 55 Ill. App. 3d 263, 370 N.E.2d 864) with respect to the

defendant's conviction of murder. However, I believe the majority correctly finds that this error did not taint the defendant's convictions of felony murder and armed robbery. Those convictions should not, therefore, be reversed on speculation that they "must have been" tainted, as suggested by the defendant on appeal. Accordingly, I would reverse the defendant's murder conviction on the basis that it was obtained as a result of reversible error in the issues instruction. We are left with the felony murder conviction and sentence standing alone, because, as the majority correctly concludes, the armed robbery conviction was a lesser-included offense of felony murder.

I do not believe that the majority has properly interpreted the supervisory order in *People v. Miller* (1980), 89 Ill. App. 3d 973, 412 N.E.2d 175. That order merely stated that "one conviction for murder" was to be vacated. In *People v. Bone* (1982), 103 Ill. App. 3d 1066, 432 N.E.2d 329, we held that, as between intentional murder and felony murder, felony murder is the less serious or "included" offense. Applying the *Bone* rationale to this case, and given the fact that the majority does not find reversible error in the issues instruction on murder, the felony murder conviction—not the intentional murder conviction—would have to be vacated. Furthermore, since armed robbery is not a lesser-included offense of intentional murder, the defendant's conviction therefor would *not* be subject to vacatur, lacking other reversible error. Obviously, by my view, the majority result cannot be reconciled with *Bone*. Nonetheless, for the reasons given, I concur in the result reached by the majority.