THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN WALDRON, Defendant-Appellant.

Second District No. 2—89—0794

Opinion filed October 7, 1991.

G. Joseph Weller, Manuel S. Serritos, and Thomas A. Lilien, all of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

The defendant in the instant case, John Waldron, along with codefendants Bryan Smith and Paul Eshom, was charged by indictment in connection with the murder of Thomas Goings. The indictment contained additional charges stemming from the incident, which occurred on September 6, 1988, at a Speedway gas station in Wheeling, Illinois, for a total of five counts. Count I of the indictment charged felony murder predicated upon armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3)); count II charged intentional murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)); count III charged knowing murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(2)); count IV charged the armed robbery of Thomas Goings (Ill. Rev. Stat. 1987, ch. 38, par. 18—2(a)); and count V charged the armed robbery of Thomas Hixon (Ill. Rev. Stat. 1987, ch. 38, par. 18—2(a)). The defendant and Smith were also separately charged with three counts of armed robbery in case No. 88—CF—1511.

Smith and Eshom both pleaded guilty prior to defendant's trial. At the conclusion of defendant's trial, the jury returned verdicts of guilty on all five counts. After the jury decided not to impose the death penalty, the trial judge sentenced defendant to a term of natural-life imprisonment for murder, a concurrent term of 60 years' imprisonment for one count of armed robbery, and a consecutive term of 60 years' imprisonment for the second count of armed robbery. Defendant's post-trial motion for a new trial was denied, and defendant filed a timely notice of appeal.

On appeal, defendant presents the following issues for our review: (1) whether the trial court improperly admitted evidence of a separate armed robbery; (2) whether the trial court erroneously admitted into evidence a video tape without an adequate foundation; (3) whether the trial court improperly allowed the jury to consider the testimony of an incompetent witness; (4) whether the State unfairly bolstered the testimony of an accomplice witness; (5) whether two of the three judgments of conviction of first-degree murder must be vacated and whether any of the convictions of armed robbery must be vacated; (6) whether defendant should be granted a new sentencing hearing for first-degree murder and whether the sentence of natural-life imprisonment was proper; and (7) whether the consecutive 60-year extended-term sentence for armed robbery should be made concurrent with that for murder and reduced to 30 years.

Among the State's witnesses at trial were Thomas Hixon and Steve Fuessle. Hixon was the manager of the Speedway gas station

on September 6, 1988, while Fuessle and Thomas Goings, the victim, were employees. All three men were at work by 6 a.m. on that date. While Hixon was behind a counter in the middle of the store he saw two men walk down the center aisle by the cigarette rack. One man wore dark pants and a dark sweatshirt with the hood over his head, and the other wore dark pants, a dark jacket, and a camouflage-pattern hat. The two men proceeded to the cash register at the west side of the store, with the man wearing the hooded sweatshirt in the lead. Each man held a gun. The man in the hooded sweatshirt lifted a long-barrelled revolver and pointed it at Goings, who was at the register. When the gun was one foot from Goings, the man demanded all the money. As Goings started to approach the register the man thrust the gun out and fired. Goings then fell to the ground behind the counter.

The man in the hooded sweatshirt then motioned Hixon, who was approximately 15 to 20 feet away, to the register and again demanded the money in a calm voice. Hixon gave him all the bills from the west register. The man in the sweatshirt said, "I know there's more." Hixon replied that there was not and offered the coin tray. The man said, "There's nothing I can do with that. I want the stuff that's under the counter." Hixon denied that there was any more money at that register and then proceeded to give the man the bills from the other register. In the meantime, Steve Fuessle, who had heard the shot while in a back-room freezer, came out to the kitchen area in the front of the store. The man in the camouflage hat then pointed a small pistol at Fuessle and ordered him to the floor in a nervous voice. After receiving the money from the second register, the man in the hooded sweatshirt again said that there was more money under the counter. Hixon denied that there was, and the two men then ran out of the store. A total of $225 had been taken.

After the two men had left, Hixon went to his office and called the police. He also switched one of the three surveillance cameras in the store to the register area and put the picture on a monitor. The monitor had been showing a picture from a camera trained on the cigarette aisle. From the video tape, Hixon identified his location at the time of the shooting and pointed out where the two offenders were shown. Hixon could not identify the shooter's face and had been unable to make an identification at a subsequent lineup. Fuessle was also unable to make an identification at a subsequent lineup.

Daniel Boyd was a customer at the Speedway gas station on the morning of September 6. While Boyd was filling his car at the north pump nearest to the building, a beige van was located at the south end of the service area. There was a driver inside and the motor was

running. As Boyd was heading for the store entrance, the two men ran out. The man in the hooded sweatshirt had his hands in the front pouch of the sweatshirt. The men then jumped into the van as it started to move. Boyd then went into the gas station.

Various police officers and paramedics arrived at the Speedway gas station minutes after the shooting occurred. Goings was deceased by that time. An autopsy performed later that day revealed that Goings had died from a gunshot wound to the center of his neck. Forensic pathologist Lawrence Blum stated that in his opinion the gun had been fired at "loose contact range" against Goings' shirt. There was some blood splattered at the entry wound. The pathologist recovered two metal fragments from the wound. A trace evidence analyst examined Goings' clothes and was of the opinion that the hole in the neck of his work smock with blackened edges was consistent with a "contact" or "near-contact" shot. An evidence technician took various photographs of the scene. The technician found a hole in the north wall of the store area behind the cash register counter and above Goings' body. A bullet jacket was recovered from the wall. In addition, there was an exit hole in the office wall behind the north wall, and a metal fragment was found in a box below the hole in the office.

Lake County Detective Rodney Brown arrived at the Speedway gas station between 7:30 and 8 a.m. He went to the office area and viewed a video tape on the store monitor. He watched the tape for the 6 to 6:45 a.m. period and then took the tape into custody. A slower-speed copy of the tape (People's exhibit No. 50) was admitted at trial and shown to the jury. Blown-up photographs of four frames on the video tape were also admitted into evidence.

Daun Milne also testified for the State. On September 5, 1988, Milne was living in an apartment in Wheeling. Paul Eshom was her roommate. During the course of that day, Milne had ingested cocaine and psilocybin mushrooms with Eshom and had taken a "Xanex [*sic*]" tablet. Eshom and Milne went to Jimmy's Bar in Island Lake on the evening of September 5. There they met the defendant, whom Milne had known previously and with whom she had taken drugs. Defendant was with Bryan Smith and introduced Smith as his bodyguard.

Milne denied that she and Eshom took drugs with defendant and Smith during the night of September 5 and early morning of September 6. Milne, Eshom, Smith and defendant left Jimmy's Bar around 3 a.m. They first headed for a bar in Wheeling, but decided not to drive since they had all been drinking. The four rode in Eshom's van to Milne's apartment. There was drinking at the apartment, but Milne did not recall anyone taking cocaine, although she might have taken

drugs by herself in the bathroom. Eshom went to sleep in the bedroom, but Milne and the others stayed up.

At approximately 5:30 or 6 a.m. defendant and Smith talked of going to the store for beer and cigarettes. While Milne was in the bathroom, defendant woke Eshom up. Defendant borrowed a sweatshirt from Milne, stating that it was cold outside and his jacket was thin. Defendant had been wearing a black leather jacket. Smith borrowed a black windbreaker from Milne. Smith, Eshom and the defendant then left the apartment for half an hour. While they were gone, Milne took some cocaine. When the three men returned to the apartment, the defendant was carrying a handful of money. Defendant pulled a .44 caliber gun from his pants and said, "I got the mother fucker." The three men sat down and divided the money into three piles, and Milne observed "a lot of extreme nervousness." When Milne asked defendant what gas station they had gone to, defendant replied that it was none of her business.

Later that morning, all four people went to an apartment in Rolling Meadows in Eshom's van. They obtained some cocaine and the four of them, plus the occupants of the house in Rolling Meadows, ingested it. Milne and Eshom then left the apartment to go to work. When Milne saw the news later that day, she learned of the killing at the Speedway gas station. She then told Eshom that they had to remove the drug paraphernalia from their apartment. Milne subsequently viewed the video tape from the gas station. At trial she identified the defendant, wearing her hooded sweatshirt, in one of the blown-up photos. The defendant's hair was long and curly on September 6.

Paul Eshom testified that he had pleaded guilty to a charge of first-degree murder in exchange for a promise of a 20-year sentence. In return, Eshom had agreed to testify truthfully at defendant's trial. Eshom had known defendant for approximately one year, having frequented the same bar and done cocaine together. According to Eshom, defendant was a heavy user of cocaine. In the month or two before September 6, 1988, Eshom himself was ingesting a half gram of cocaine three times a week by snorting it or injecting it.

Eshom and Milne drove to Island Lake in his van on the evening of September 5. Eshom had two loaded handguns in the van—a .44 revolver and a .22 revolver. Eshom and Milne went to Jerry's Tap at around 8 p.m. and met the defendant. Defendant was with Smith, whom Eshom had met once before. Over the next four hours, Eshom saw defendant consume four to six vodka drinks. Defendant also injected cocaine about six times in Eshom's van. All four persons

shared the cocaine which defendant supplied. Eshom also drank beer. Around 1 a.m., Eshom drove his three companions to another bar. In the hour that they were there, defendant had one or two more drinks, while Eshom had more beer. From the second bar, the group started toward a third bar. However, Eshom was tired and did not want to go, so he drove to his and Milne's apartment, arriving around 2:30 a.m. Eshom brought the guns inside and placed them in a drawer. Eshom had a beer and took a couple of "Xanex [*sic*]" tablets so he could go to sleep. The cocaine had been keeping him awake until then. Eshom went to bed and did not see if any drugs were taken by the others, although Milne did come into the bedroom for a couple minutes and injected some cocaine.

At approximately 6 a.m. on September 6, the defendant woke Eshom up and said, "Bryan and I need a ride. We're going to rob a gas station. We want to borrow your guns. All you have to do is drive your van, and we'll go in and get the money." Eshom responded, "Okay." Eshom got out of bed and gave the defendant the two guns. Defendant kept the .44 and gave the .22 to Smith. Defendant then asked Milne for something to wear to cover their faces, and Milne gave him a sweatshirt and coat. The three men then departed. Eshom knew the area and drove the van. During the ride, defendant asked if Eshom had a hat for Smith. Eshom gave Smith a camouflage hat from the van. Eshom drove to the Speedway gas station and asked defendant, "How does that look?" Defendant responded, "It looks fine." Eshom then parked at the south side of the gas station. Defendant and Smith then got out of the van. The hood on defendant's sweatshirt was up. Eshom sat and waited in the van for a few minutes. When defendant and Smith ran out from the building and got into the van, Eshom drove away. Defendant had the .44 in one hand and the money in the other. During the ride back to the apartment defendant said, "I got the money, and I shot a guy. He hesitated, so I shot him. I think I got him right in the chest."

Once they reached the apartment, Eshom put the guns back in the drawer. Defendant gave Eshom the money, and he divided it into three piles. No alcohol or drugs were taken at that time. Defendant, Smith, Eshom and Milne then left the apartment at about 7 a.m. Eshom brought along the guns in a plastic bag so that the police could not find them. The defendant directed Eshom to an apartment in Rolling Meadows. The four went inside, with Eshom carrying the guns. Once inside, Eshom gave defendant the guns and the defendant took them to a bedroom. The four then purchased one-sixteenth ounce of cocaine for $125. All four persons took the cocaine. Between 9 and

9:30 a.m. Eshom and Milne departed, leaving the guns with the apartment owner. Defendant and Smith stayed at the apartment.

Later on September 6, Eshom was again at Jerry's Tap. Eshom talked with the defendant by phone, and defendant told Eshom to get the van off the road and to lie low. Eshom replied that he planned to do that. Eshom left the van at Milne's sister's house in Island Lake. He hid the camouflage hat at his mother's house, where the police later recovered it. Eshom turned himself in to the police later in the week of September 6.

Bryan Smith testified that he had pleaded guilty to a charge of first-degree murder and had not received any promises as to his sentence. Smith was with the defendant for 8 to 10 days before September 5, 1988. Defendant never slept during that period and was pretty much doing drugs and drinking alcohol continuously. On September 5, Smith and the defendant injected and snorted cocaine many times and were also drinking. The two met Eshom and Milne that night at Tony and Jenny's Bar. They took some cocaine in Eshom's van. All four then went back to Milne's apartment and snorted more cocaine.

Smith was awakened by defendant at approximately 5:30 or 6 a.m. on September 6. Eshom left the apartment, but then returned with two guns and gave them to defendant. Defendant kept a .44 caliber gun and gave Smith a .22. Smith and defendant then obtained jackets from Milne to conceal the weapons. Defendant took a hooded sweatshirt. The three men then left the apartment. Smith rode in the back of the van while Eshom drove. Defendant told Smith that he needed to wear a hat, so Smith used one from the van. Defendant appeared to Smith to be in control and to act as he always did, and Smith himself knew what he was doing. At the Speedway gas station, Smith and the defendant went inside. They walked up adjoining aisles. When defendant got in front of Smith he told Smith to follow his lead. Smith then followed defendant to the front of the store.

When defendant reached the front of the store he pulled out the .44, pointed it and demanded money from the cashier, Thomas Goings. The cashier emptied the front register and gave defendant the money. Defendant stated, "This better not be all of it." When the cashier leaned forward, defendant extended the gun and fired. The cashier fell back and slid to the floor. A couple seconds after the shot, somebody came from a back room. Smith pulled his gun and the man lay on the floor. Defendant demanded the rest of the money from a second person behind the counter. This employee gave defendant the change from the first register and bills from a second register. Smith and defendant then ran out to the van, and Eshom drove away. Dur-

ing the ride, Smith asked defendant why he had shot the cashier. According to Smith, the defendant said, "Because he hesitated. I ain't got time for that shit."

When they arrived at Milne's apartment, the defendant walked in first, waiving the money in one hand and the gun in the other and saying, as if he were singing, "Yeah, yeah, yeah." Smith, who stated that he was sweaty and scared, threw his gun on the table and went to the bathroom. When he came out there were three piles of money on the table, and each man took one. Half an hour later, the three men and Milne went to Smith's friend's apartment in Rolling Meadows, where they bought one-sixteenth ounce of cocaine for $125. They injected the cocaine, and Milne and Eshom departed after about 45 minutes. Smith then went to sleep while defendant did more cocaine.

At about 5 or 6 p.m., defendant and Smith went to Art's house in Wauconda. Art was not home, but they found him at Jerry's Tavern. Smith asked Art for some .44 cartridges since defendant had said they should fill the chambers of the gun with live cartridges in case the police caught up with them. They returned to Art's house, where Smith received seven .44 cartridges, which he gave to defendant. Smith and defendant then went back to Jerry's Tavern. There they met Vicky Hansen and Hansen's friend, Heidi. On the way from Jerry's Bar to the Harbor Lights Bar with the women, defendant discarded a spent cartridge and reloaded the gun. From the Harbor Lights Bar, defendant, Smith and the women returned to Art's. Defendant told Heidi to leave at some point, and Hansen and the two men then received a ride from Michael Kremer, whom the defendant had called. According to Smith, defendant told Kremer that the person who had been shot owed him $12,000 for cocaine.

Defendant, Smith, Hansen and Kremer then went to Twins Bar. Once there, defendant called a friend of his named Turk. The four then left Twins Bar, and Kremer dropped defendant, Smith and Hansen off at Turk's trailer. Kremer then left. Hansen then bought a bottle of vodka and the men drank screwdrivers. After a while, defendant and Smith took the .22 and .44 guns and headed for a bar called J.J. Twiggs. On the way, defendant said that he wanted to rob the place. Defendant and Smith did so, with defendant using the .44. When they returned to the trailer park, defendant wanted to climb a fence and handed Smith the .44. The two ended up going around the fence, however, and were then confronted by the police. Smith discarded the guns as he walked, but was subsequently arrested.

Vicky Hansen, who had known defendant for about a month prior to the events of September 6, 1988, also testified. On September 6

Hansen went to Jerry's Tap with her friend Heidi at around 3 p.m. At about 6:45 p.m., Heidi met Smith and defendant in the parking lot. Heidi then went into the bar and told Hansen that they were leaving. Heidi offered Smith and the defendant a ride and then drove to the Harbor Lights Bar, where defendant, Smith, Heidi and Hansen had drinks. According to Hansen, defendant drank three or four screwdrivers in an hour. Heidi then drove the group to the home of Art, a friend of Smith's, in Williams Park. During the ride defendant told Hansen that he had shot and murdered someone that morning. Defendant told Hansen that the man he shot owed him $12,000 as a cocaine debt. Defendant then showed Hansen the .44 caliber gun, which he took from his waist band. At one point during the ride, defendant took an empty cartridge from the gun and threw it out the window. He reloaded the gun with a cartridge from a paper bag or box. At Art's house, Smith's friends tried to talk him into turning himself in. In addition, defendant asked Hansen to get rid of Heidi, who was getting "hyper." At one point defendant got mad at Heidi and told her that he would blow her head off if she did not shut up. Heidi did in fact leave.

According to Hansen, defendant then made a phone call to a person named Mike. After the phone call, defendant asked Art if he would be willing to switch guns with him. Art declined. Defendant, Smith and Hansen then left and started walking down the road to meet the person defendant had called on the phone. The three were subsequently picked up on the road by Mike Kremer. The group first went to a bar in Lake Zurich called Twins. Finally the group went to the trailer of a person named Turk. While at Turk's trailer, Hansen saw a clip about the Speedway robbery on the news. At first, defendant said, "I'm not a murderer," but then stated, "Well, he deserved to die." Defendant and Smith then left the trailer to get pizza from J.J. Twiggs. They took the guns, and defendant wore Kremer's jean jacket. Hansen did not call the police because she was scared. She was subsequently arrested at the trailer.

Michael Kremer, who had been an acquaintance of defendant for approximately 15 years, and who had last seen the defendant approximately two months prior to the events of September 6, also testified. At about 9 p.m. on September 6, defendant phoned Kremer at Kremer's home in Wauconda. Defendant stated that he was in a real jam and needed a ride to Lake Zurich. Kremer agreed to pick up the defendant and headed for Williams Park. During the ride to Lake Zurich, defendant said that he had shot a man during a robbery of a gas station in Buffalo Grove. Kremer stated that he thought defendant

was joking but did not want to be seen with him. Smith and Kremer then removed magnetized company signs from the doors of Kremer's truck. Defendant told Kremer to watch the news, because "[t]hey've got it on tape." Kremer then told defendant that he would have to get his long hair cut. Defendant replied that he would not have to do so because his hair had been covered with a hood. Defendant stated that he had used the .44 caliber gun and that it had a hair trigger. Defendant asked Kremer to trade a gun for the .44, but Kremer refused. Kremer then asked why defendant had shot the man, and defendant replied, "He looked at me like I was a scum bag, so I shot him."

Kremer drove defendant and the others to a bar called Twins in Lake Zurich. They went in and had a couple drinks. Defendant said that he had to call "Turk" or "Turcotte." After the call, the group quickly left the bar. Kremer then drove the others to a trailer park off Route 22 and dropped them off. He gave Hansen his jean jacket. According to both Kremer and Hansen, defendant was calm and knew what he was doing. Kremer then went home and watched the news. After watching the news and seeing the story about a shooting, Kremer dialed 911 and spoke with the Wauconda police. Kremer went to the police station and later met with Lake County Sergeant Charles Fagan there. Kremer then showed Fagan the trailer park.

Christopher Johnson, an employee of J.J. Twiggs, testified that he and five other patrons and employees were at the establishment around 12:50 a.m. on September 7, 1988. According to Johnson, defendant and Smith entered the bar, had a drink, and then departed. As defendant passed a video machine on the way out, he made a reference to shooting it. When Johnson walked out of the bar five minutes later, defendant had the .44 caliber gun, and Smith had a smaller gun. Defendant claimed to be a "MEG agent" and put Johnson against a wall and frisked him. The five other persons from the establishment received the same treatment as they departed. Money was taken from some of them. According to Johnson, defendant fired the gun twice and also pulled the hammer back at least three times, but then released it. The incident at J.J. Twiggs lasted until 1:45 a.m.

Sergeant Charles Fagan and various other Lake County law enforcement officers testified about their actions after being contacted by Michael Kremer. Various officers went to the Lake Zurich trailer park, which was one-half mile from J.J. Twiggs. They located "Turk's" trailer and set up a perimeter around it. At about 2 a.m. defendant and Smith approached the trailer. When one officer identified himself and ordered the two to stop, they walked in different di-

rections and defendant said, "Fuck you, pigs." Smith dropped two guns as he walked. Both guns were recovered. Smith and defendant were then arrested. Defendant had some .44 caliber cartridges in his pocket.

Firearms and tool-marks examiner Robert Wilson examined the weapons, ammunition and recovered fragments. The .22 caliber gun was fully loaded. The .44 caliber revolver contained two fired cartridges and four live cartridges. One fired cartridge was a different brand than the other five cartridges. Wilson test-fired the gun and concluded that the jacket fragment recovered from the Speedway gas station was fired in the .44 caliber gun. The .44 could be fired single action or double action. A person could cock the hammer, but then replace it slowly without causing the gun to discharge. Ten pounds of pressure were needed to fire the gun in the double-action mode, while 4½ pounds would fire the gun in the single-action mode. In Wilson's view, the gun would not discharge accidentally.

After the State rested, the only defense evidence presented was a single stipulation. The parties stipulated that, if the defense were to call police officer Leroy Pugesek, he would testify that he was one of the deputies who arrived on the scene of the Speedway gas station on the morning of September 6, 1988. In addition, Officer Pugesek would have testified that he spoke with Thomas Hixon and that Hixon told him that the man with the revolver demanded all the money and that "without hesitation, the subject fired one shot from the gun into Thomas Goings." The defense then rested. After hearing closing arguments and receiving instructions, the jury returned guilty verdicts for three counts of murder and two counts of armed robbery. A death penalty sentencing hearing followed, at which the jury found that the defendant was eligible for the death sentence. After hearing evidence in aggravation and mitigation, the jury was unable to return a unanimous verdict sentencing defendant to death. The trial court thereafter sentenced defendant to a term of natural-life imprisonment for first-degree murder with a concurrent 60-year term for the armed robbery of Thomas Goings and a consecutive 60-year term for the armed robbery of Thomas Hixon.

We first address defendant's contention that the trial court improperly admitted evidence of a separate armed robbery. Specifically, defendant argues that the prejudicial impact of the evidence of an armed robbery committed by defendant and Smith at the J.J. Twiggs tavern at approximately 1 a.m. on September 7, 1988, outweighed whatever probative value such evidence may have possessed. Prior to jury selection the trial court had denied defendant's motion *in limine*

to exclude evidence of the J.J. Twiggs robbery, the subject of charges in case No. 88—CF—1151.

Generally, evidence of other crimes is inadmissible if relevant merely to establish the defendant's propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.) Evidence of the commission of other crimes is admissible, however, when such evidence is relevant to prove any purpose other than propensity to commit crime, such as *modus operandi*, intent, identity, motive, or absence of mistake. (*McKibbins*, 96 Ill. 2d at 182; see also *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 484-85.) It is within the sound discretion of the trial court to determine whether evidence of other crimes is relevant to a material issue and whether the probative value of such evidence outweighs its prejudicial impact; this determination will be overturned only if there exists a clear abuse of discretion. *People v. Fuller* (1983), 117 Ill. App. 3d 1026, 1036.

■ In resolving the issue relating to the admissibility of evidence of other crimes, the trial court, in denying defendant's motion *in limine*, stated that, although not the only basis for admission, the firearm identification and the identification of the person using the firearm within a short time period of the use of that firearm for a murder was "significant, relevant, probative and that its probative value outweighed any potential prejudice." During the State's case in chief, Christopher Johnson and Bryan Smith were the only witnesses who testified about the J.J. Twiggs robbery. Johnson's and Smith's testimony in this regard was brief and not so detailed that the jury might have been overpersuaded to convict defendant only because it felt he was a bad person deserving punishment. (*People v. Musitief* (1990), 201 Ill. App. 3d 872, 876.) During direct examination of Johnson, the trial court gave the following admonishment to the jury:

> "I want to advise the ladies and gentlemen of the jury I will be instructing the jury concerning particular evidence which we call proof of another crime, other crimes, which is limited to particular purposes, and it is only being presented to you for a limited purpose."

Moreover, at the close of all of the evidence and before the jury began its deliberations, the trial court instructed the jury as follows:

> "Evidence has been received that the defendant has been involved in offenses other than that charged in the indictment. This evidence has been received solely on the issues of the defendant's identification, intent, and knowledge. This evidence may be considered by you only for the limited purpose for

which it was received." (Illinois Pattern Jury Instructions, Criminal, No. 3.14 (2d ed. 1981).)

Finally, in denying defendant's post-trial motion for a new trial, the trial court stated:

"Again, as to the J.J. Twiggs armed robbery evidence, we limited the evidence that went in. It wasn't all of the witnesses, and all the detail, and things, such as went in in the aggravation stage of the trial. That that was put in, when we consider the identification of the weapon, so close in the possession of the defendant, and so closely connected to the time that that weapon was tied to the death in this case, certainly gave sufficient grounds for its admission—admissibility. Again, in this particular case, while proof of another crime has, is, by very nature of what it is of a what you might call prejudicial nature, even if, in this case, it was—it would have been error, which it was not, to admit that into evidence, in this case the very overwhelming nature of the remaining evidence in this case would make it harmless error if it had been error, which it was not."

Defendant argues that *People v. Richardson* (1988), 123 Ill. 2d 322, relied upon by the State in support of its argument that such evidence of other crimes is admissible, is in fact distinguishable and should not be relied upon by this court. We disagree. In *Richardson*, the defendant was convicted of murder, felony murder, and armed robbery. On appeal the defendant argued that the trial court had erred in allowing into evidence testimony of an armed robbery and shooting which took place four days after the murder for which defendant was on trial. Though the weapon used at both incidents was not recovered, bullets were recovered from each shooting, and expert testimony indicated that the bullets recovered were fired by the same gun. The victim and a witness at the second incident testified and identified defendant as the gunman. As to the murder, several witnesses identified defendant as the murderer. Noting that the evidence of the second shooting clearly tended to identify the defendant as the perpetrator of the initial murder, the trial court in *Richardson* found that the evidence of the subsequent robbery was highly relevant to a determination of whether the defendant was also the man holding the weapon at the murder. (*Richardson*, 123 Ill. 2d at 339-40.) Defendant argues that *Richardson* is distinguishable based on the fact that evidence of the J.J. Twiggs robbery was not necessary to link defendant to the gun, since the State had already presented other testimony for that purpose. However, whereas in *Richardson* there existed positive identifications of the defendant re-

garding both occurrences, here, other than Bryan Smith, a codefendant, there were no eyewitnesses able to identify defendant at the murder scene. Both Thomas Hixon and Steve Fuessle were unable at subsequent lineups to identify defendant as the person who shot Thomas Goings on September 6. Thus, the evidence of the J.J. Twiggs robbery, consisting of testimony identifying defendant and the .44 caliber weapon, is even more relevant than the evidence of other crimes presented in *Richardson*. In summary, we conclude that the facts of the instant case are not so different from those in *Richardson* to warrant a different result.

We also believe that evidence of the J.J. Twiggs robbery was admissible to prove the absence of mistake or accident. In this regard, we disagree with defendant's contention that he never raised a claim at trial that the gun had been fired accidentally. As the State's ballistics expert Robert Wilson testified that, based upon the mechanical condition of the .44 caliber weapon, he did not see how it could be fired accidentally. On the other hand, Michael Kremer testified that defendant had told him that the .44 had a hair trigger. Thus the testimony of these two witnesses did in fact place the issue of an accidental firing before the jury. We furthermore agree with the State that the manner with which the defendant was able to handle the weapon became an issue in the case and that the testimony of Christopher Johnson as to the manner in which defendant handled the weapon while at J.J. Twiggs tends to be probative of that issue. Finally, we note that the only evidence defendant presented at trial was a stipulation to the effect that, if Officer Leroy Pugesek were to testify, he would state that Thomas Hixon told him that after demanding money from Thomas Goings, defendant, without hesitation, shot Thomas Goings. We believe that a possible inference from this stipulation evidence might be that as defendant raised the gun towards Goings and demanded the money, the gun accidentally fired. Thus, defendant's protestations to the contrary notwithstanding, we believe that evidence of the J.J. Twiggs robbery was admissible to show the absence of mistake or accident. Such evidence was relevant for a purpose other than to show defendant's propensity to commit crime and was therefore admissible. (See *People v. McKibbins* (1983), 96 Ill. 2d 176, 186.) The trial court did not err in admitting the disputed evidence.

We also believe that even if it was error to admit the evidence, any such error would not require reversal. There was overwhelming evidence of defendant's guilt, and we agree with the trial judge that any error was harmless and unlikely to have contaminated or preju-

diced the jury. See *People v. Richardson* (1988), 123 Ill. 2d 322, 343-44.

We next consider defendant's contention that the trial court erred in admitting a copy of a video tape taken from the video surveillance system at the Speedway gas station. Defendant argues that the State failed to lay an adequate foundation for the introduction of the video tape through the testimony of Officer Rodney Brown, in that Brown could not verify on the basis of personal knowledge that the video-taped evidence accurately represented the events which had occurred at the Speedway gas station. (*People v. Mines* (1971), 132 Ill. App. 2d 628.) Defendant maintains that the alleged error must be held to be prejudicial to defendant since the jury could have studied the video tape in determining whether defendant was one of the two offenders portrayed in the video tape. Furthermore, the latter portion of the tape, which shows the body of Thomas Goings lying behind the store counter in a pool of blood and reflects efforts to provide medical assistance, could only have served to inflame the jurors' passions against defendant.

The State responds by arguing that defendant has waived any alleged error in the admission of the video tape by failing to claim the error in his post-trial motion. Defendant maintains that the exhibit was admitted over a defense objection to foundation and that, although the alleged error was not preserved in the motion for a new trial, the plain error rule should apply under the facts of this case.

■ Initially, we note that defendant's statement in his brief that the video was admitted "over a defense objection to the foundation" is somewhat misleading. The following colloquy between the court and defense counsel is illustrative of what actually transpired:

"MR. STEPANICH [Defense Attorney]: I think the foundation has been laid, but I'm going to object to it, for the record, but—

THE COURT: Without any further objection than that, I will overrule the objection. Go ahead.

\* \* \*

THE COURT: Is there any other objection as to 50 other than that previously made?

MR. STEPANICH: And relevancy, you [*sic*] Honor.

THE COURT: Yes.

MR. STEPANICH: Just relevance."

From the above, it is arguable that defendant expressly waived any objection based on a lack of foundation. As to any argument based on

relevance, defendant does not contest the relevancy of the video-taped evidence on appeal, and we do not now consider it.

It is well settled that both a trial court objection and a written post-trial motion raising the issue are required to preserve allegations of error. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Failure to do either constitutes waiver of the alleged error. We do not believe that the precise argument made in this court, that the State failed to lay a proper foundation, was ever made to the trial judge. If the argument had been made, the State would have had an opportunity to correct any deficiency in the foundation proof. See *People v. Rivera* (1989), 182 Ill. App. 3d 33, 43.

An exception to the waiver rule is contained in Rule 615(a) (134 Ill. 2d R. 615(a)), also known as the plain error rule, which provides that plain errors affecting substantial rights may be noticed even though they were not brought to the attention of the trial court. The plain error rule is a limited exception to the waiver doctrine and does not mandate that a reviewing court consider all errors involving substantial rights whether the same have been brought to the attention of the trial court. (*People v. Carlson* (1980), 79 Ill. 2d 564, 577-78; *People v. Pickett* (1973), 54 Ill. 2d 280, 282.) Issues which were waived will be considered only if the evidence is closely balanced or if the error is of such magnitude that the commission thereof denies the accused a fair and impartial trial. *People v. Gacho* (1988), 122 Ill. 2d 221, 239; *Carlson*, 79 Ill. 2d at 576-77; *Pickett*, 54 Ill. 2d at 283.

We find that neither basis for invoking the exception to the waiver rule applies. The evidence in this case was far from closely balanced. Rather, the State presented overwhelming evidence of defendant's guilt. Nor do we believe the alleged error to be of such magnitude that its commission denied defendant a fair and impartial trial. In making this determination, we note that defendant objects only to the technical defect of lack of proper foundation testimony; he does not suggest that the video-taped evidence is otherwise objectionable. Moreover, this court has viewed the video-taped evidence, and we note that, due apparently to the quality of the video equipment and the positioning of the cameras, the evidence presents a less clear image of the gas station itself and the victim than do the State's exhibits Nos. 6 through 11, which consist of various 8 x 10 close-up color photographs of the deceased. Although these photographs are arguably more prejudicial to defendant's case, defendant does not argue their inadmissibility on appeal. Accordingly, we conclude that any error in this regard is waived.

Next, we consider defendant's contention that the trial court improperly allowed the jury to consider the testimony of an incompetent witness. Specifically, defendant argues that the trial court erred in denying defendant's motion to exclude Daun Milne's testimony since she was under the influence of drugs both during the time she observed the events surrounding the crime and while giving testimony at trial.

■ We note at the outset that defendant's objection to Milne's testimony, made in a motion to strike immediately following the testimony and also in his post-trial motion, refers only to the argument that the testimony should be stricken due to drug use at trial. Defendant's argument that the testimony should also be stricken due to drug use at the time the events to which she testified took place is raised for the first time on appeal. Based on this observation, we conclude that, for purposes of this appeal, defendant has effectively waived, by failing to raise such an argument with specificity at trial and in his post-trial motion, consideration of the argument that Milne's testimony should be stricken because she was under the influence of drugs on September 6 to 7, 1988. *People v. Enoch* (1988), 122 Ill. 2d 176, 186.

We proceed to consider whether the testimony should have been stricken due to drug use at trial. During cross-examination, defense counsel elicited the following from Milne:

"MR. STEPANICH [defense attorney]: Have you used any [cocaine] now before you testified here this morning?

A. Um—yeah.

Q. Okay. How long ago did you use the cocaine?

A. How long ago?

Q. Yes, did you take it.

A. Well, what's it—Do I have to answer this?

THE COURT: Yes, you do.

Q. [Defense Attorney:] Yes.

A. Well, god, I did some, you know, last week; I did some yesterday, you know."

Defendant argues that the above reveals Milne's drug condition at the time of trial. We would point out, however, that while defendant infers from Milne's statements that she took cocaine on the day of trial, another interpretation is also possible. In response to defense counsel's question as to how long ago Milne used cocaine, Milne replied, "last week" and "yesterday." She did not explicitly state that she used cocaine on the day she was testifying.

At the conclusion of cross-examination, defense counsel made a motion, based on Milne's words and actions during her testimony, that

Milne was under the influence of drugs and that her testimony should be stricken. In ruling on the motion, the trial court stated:

"Well, as to believability, that's a factual matter for the jury. I take it in a sense what you're addressing can go to the same thing that you might have with someone of a young age or something else going as an issue as to competency where in certain instances the Court can make a preliminary determination. That's a determination as a matter of law.

In listening and viewing the witness on the stand who was responsive to questions, the witness was competent to answer questions. The issue for credibility is one for the jury, and the motion is denied."

In addressing this issue at the hearing to consider defendant's post-trial motion, the court also stated:

"I don't think I need to comment any further on the remaining matters that are raised, with the exception of the testimony of Daun Milne. In this particular case, the jury heard the use—about the use of drugs. They also heard, you know, a lot of testimony about the use—about people using drugs. There was nothing indicating to this court that the witness was legally incompetent ***. It was a question of weight, not of admissibility."

■ A determination of whether a witness is competent to testify is within the sound discretion of the trial court and may be arrived at either through conducting a preliminary inquiry or by observing the witness' demeanor and ability to testify during trial. (*People v. Spencer* (1983), 119 Ill. App. 3d 971, 976.) While decisions as to competence are reviewable, such determinations will be overturned only when it appears that the trial judge has abused his discretion. (*People v. Garcia* (1983), 97 Ill. 2d 58, 75.) Our review of the record indicates that, although Milne's testimony was at times confusing in response to questions asked of her, she had the capacity to observe, recollect and communicate. Thus she was competent to testify, and any of the perceived problems regarding her testimony merely affected her credibility and the weight to be accorded her testimony. (*People v. Scott* (1982), 108 Ill. App. 3d 607, 610.) In light of the trial court's opportunity to take into account the demeanor of this witness, we cannot say that the trial court abused its discretion in this regard. *Garcia*, 97 Ill. 2d at 75.

■ Defendant also contends that the State unfairly bolstered the testimony of one of its accomplice witnesses. Specifically, defendant argues that the State improperly bolstered the credibility of Paul

Eshom by eliciting the fact that Eshom had, as part of his plea-bargain arrangement, agreed to testify truthfully and that a judge would determine if Eshom told the truth. Defendant points to the following testimony as being objectionable in nature:

"MR. WALLER [assistant State's Attorney]: Mr. Eshom, you were—you are a defendant in this case, is that correct?

A. That's right.

Q. Have you, prior to today's date, entered a plea in this case?

A. Yes, plea of guilty.

Q. What charge did you plead guilty to?

A. First degree murder.

Q. And was that in return for a promise that you would receive a specific sentence?

A. Yes.

Q. What was that promise?

A. Sentence of 20 years.

Q. And in return for receiving that sentence of 20 years in the penitentiary, do you have any promises that you have to fulfill?

A. Just to get up here and tell the truth.

Q. And who is going to determine if you told the truth?

A. The judge is."

The State observes, and our review of the record confirms, that defendant has failed properly to preserve this issue for appeal either by objecting to the testimony at trial or by raising the issue in his post-trial motion. Pursuant to *People v. Enoch* (1988), 122 Ill. 2d 176, 186, the issue is therefore waived. Even if the issue had been properly preserved, we note that the allegedly improper testimony constitutes but a small fraction of the 60 pages of testimony Eshom provided. There clearly was no undue repetition or emphasis placed upon the agreement to testify truthfully. Under these circumstances, we cannot conclude that an error affecting substantial rights was committed so as to justify a circumvention of the waiver rule.

Defendant next contends that two of the three murder convictions and both, or at least one, of the armed robbery convictions must be vacated. We address the issue of the murder convictions first. In this regard, the State concedes, as it must, that two of the three murder convictions must be vacated, as there was only one murder victim. However, while the defendant argues that only the felony-murder conviction should be allowed to stand, the State argues that the conviction of intentional murder should stand. Both defendant and the State

agree that *People v. Mack* (1984), 105 Ill. 2d 103, should control the threshold question regarding multiple convictions of a single murder.

In *Mack,* our supreme court summarized the facts and law on this issue as follows:

"The defendant was convicted of three counts of murder. Only one person (Kolar) was killed, however. The defendant was charged (1) with intentionally and knowingly shooting and killing Kolar; (2) with shooting and killing Kolar with a gun knowing that such shooting with a gun created a strong probability of death or great bodily harm to Kolar, and (3) with shooting and killing Kolar while committing a forcible felony, armed robbery. There was evidence to support a conviction of all three charges, but there was only one man murdered, and therefore there can be but one conviction. (*People v. Szabo* (1983), 94 Ill. 2d 327, 350.) When multiple convictions are had for offenses arising out of a single act, the rule is that the sentence is imposed on the most serious offense. (*People v. Donaldson* (1982), 91 Ill. 2d 164, 170; *People v. Duszkewycz* (1963), 27 Ill. 2d 257, 261.) In the latter case the court turned to the appraisal of the General Assembly to determine which was the more serious crime. In this case the penalty provided by the legislature gives us no help in making the determination as to which of the three murder charges is the most serious because the penalty for all three may be death. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b).) We consider, however, the intentional and knowing killing of Kolar to be the most serious crime of the three charged because an intentional and knowing killing involves a more culpable mental state than either shooting Kolar with a gun knowing the shooting created a strong probability of death or great bodily harm, or shooting and killing Kolar in the course of an armed robbery. Therefore, the conviction of murder for intentionally and knowingly shooting and killing Kolar will be affirmed. The other two murder convictions will be vacated." *Mack,* 105 Ill. 2d at 136-37.

The State argues that, following *Mack,* this court should affirm the intentional and knowing killing of Thomas Goings and vacate the other two convictions. Defendant, while recognizing the validity of *Mack* in general, urges us to affirm only the felony-murder conviction. Defendant argues that, according to *People v. Abrams* (1982), 109 Ill. App. 3d 901, and due to trial court error pertaining to the counts charging intentional and knowing murder, only the felony-murder conviction can stand.

We first note that *Abrams* is not dispositive of the issue before us. In *Abrams*, the defendant was convicted of murder, felony murder, and armed robbery. Unlike the present case, however, the defendant in *Abrams* was thereafter sentenced to 20 years' imprisonment on the felony-murder conviction and a concurrent 10 years as a result of the armed robbery conviction; no sentence was imposed on the murder conviction. The court held that the convictions of murder and armed robbery must be vacated as lesser-included offenses of felony murder and that issues raised as to alleged trial court error on the murder charges were therefore moot. (*Abrams*, 109 Ill. App. 3d at 907, 910.) We also note, and agree with, the special concurrence in *Abrams*, where Presiding Justice Barry pointed out that in *People v. Bone* (1982), 103 Ill. App. 3d 1066, that court held that, as between intentional murder and felony murder, felony murder is the less serious or "included" offense. (*Abrams*, 109 Ill. App. 3d at 911 (Barry, P.J., specially concurring).) Thus, to the extent that *Abrams* stands for the proposition that intentional murder is a lesser-included offense of felony murder, we decline to follow that decision.

■ We proceed to consider whether defendant's conviction of intentional and knowing murder should be vacated due to alleged trial court error. Defendant first argues that the trial court abused its discretion in responding to a question submitted by the jury during deliberations. During deliberations, the jury sent the trial judge two written notes. One note concerned a request for a certain transcript and is not at issue on appeal. The trial judge read the other note into the record as follows:

> "The other one says, 'Please define,' open quotes, "Intent," dot, dot, dot, close quote, 'regarding: One, premeditation,' open parens, 'before entering station,' close parens. 'Two, premeditation prior to pulling trigger intending to kill,' and intending to kill is written in a different color ink, and then they go back to the original color. 'Three, by pulling a trigger while pointing a weapon, is this intent to kill?' Question mark. Also signed by the foreperson."

After a lengthy discussion between the trial judge and counsel, the court ruled as follows:

> "Again, the problem is that I don't read clearly the question—the question as being as clear as the State feels or as the defense feels concerning this premeditation business or whatever they think premeditation is or what have you; and I don't want to read into their questions and add matters. They have received the law. The issues instruction is clear, is one of the

more clear and unambiguous instructions in those that are supposed to all be clear and unambiguous.

At this point, considering the way this is written, I have simply at the bottom of the note written, 'You have received the instructions, consider those instructions. Judge Block.' And I've already made a record as to how I answered the other one."

Defendant now argues that the trial court erred when it failed to instruct the jury as to the statutory definition of "intent," which provides:

"Intent. A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish the result or engage in that conduct." Ill. Rev. Stat. 1987, ch. 38, par. 4—4.

This court has stated that if the jury asks specific questions on a point of law arising from facts over which there is doubt or confusion, the court should respond in an attempt to clarify the confusion. (*People v. Pryor* (1989), 181 Ill. App. 3d 865, 871.) We also stated, however, that the trial court may, in the exercise of its discretion, refrain from answering questions from the jury when the given instructions are readily understandable and sufficient to explain the relevant law. *Pryor*, 181 Ill. App. 3d at 871.

Defendant maintains that *People v. Brouder* (1988), 168 Ill. App. 3d 938, should govern our resolution of this issue. After finding the defendant not guilty of telephone harassment, the jury in *Brouder* informed the court that it was at a "definite deadlock" on a resisting arrest charge. The jury sent several written questions to the trial judge which indicated that the jury was confused as to the meaning of "knowing resistance." For example, the jury in *Brouder* twice asked the trial court, "In specific terms, what defines 'knowingly resisting arrest?' " The jury also asked the judge: "We are confused as to the 'knowingly resistance' to being arrested. Does it mean a mental state of refusing to be arrested and thereby running away, physically fighting? Will a step or two away mean resistance?" The trial court twice responded that the jury had received the instructions and should continue deliberating. Defense counsel then asked the court to give a pattern jury instruction defining "knowingly," but the court reserved its ruling. Before the trial court gave its ruling, the jury found the defendant guilty of resisting arrest. The appellate court reversed, finding that, where the jury had on several occasions clearly and specifically demonstrated confusion as to a question of law, the trial

court should have instructed the jury on the definition of "knowingly." *Brouder*, 168 Ill. App. 3d at 946-48.

We agree with the State that *Brouder* need not control our resolution of this issue. There are several factors which distinguish *Brouder* from the instant case. First, the jury in this case did not inform the trial court that it was at a "definite deadlock" on any of the charges, as did the jury in *Brouder*. In addition, while the jury in *Brouder* twice asked for a "specific" definition and also, in a third note, explicitly stated that it was "confused" as to that definition, the jury here tendered but one note to the court requesting clarification. The request was never repeated. Under these circumstances, we cannot say that the jury so clearly manifested such confusion and doubt so as to require the trial court to reinstruct on the issue of intent. Rather, we believe the trial judge, in a proper exercise of his discretion, correctly refrained from further instructing the jury. *Pryor*, 181 Ill. App. 3d at 871.

▪ Defendant also argues that his convictions of intentional and knowing murder should be vacated due to the trial court's refusal to instruct the jury on the affirmative defense of voluntary intoxication. On this issue, the Illinois Supreme Court has stated that "[a] trial judge has the discretion to refuse to tender a defense instruction on intoxication where there is insufficient evidence for a jury to reasonably find that the defendant was so intoxicated at the time of the crime that he lacked the requisite mental state for the crime." (*People v. Arnold* (1984), 104 Ill. 2d 209, 214, citing *People v. Williams* (1973), 14 Ill. App. 3d 789, 794.) We conclude that the trial court did not abuse its discretion in refusing the tendered defense instruction.

Defendant points to the testimony of Bryan Smith and Paul Eshom to suggest that sufficient evidence was presented to justify an instruction on voluntary intoxication. As the State correctly observes, however, the testimony of Smith and Eshom, along with the testimony of Thomas Hixon and Steve Fuessle, demonstrates that, although defendant had ingested alcohol and drugs, he was still quite in control of his actions. Evidence that defendant had been drinking and taking drugs is not enough, in and of itself, to require that the instruction on intoxication be given. (*Williams*, 14 Ill. App. 3d at 793.) There is simply nothing in the record, other than ingestion of alcohol and drugs, to suggest that defendant was so intoxicated as to negate the requisite mental state for murder.

We further conclude that this case is clearly distinguishable from *People v. Feagans* (1983), 118 Ill. App. 3d 991, which defendant argues should control in the instant case. In *Feagans*, the defendant

gave "unrebutted" testimony that he had consumed in excess of a case of beer on the day in question. Other witnesses corroborated the fact that the defendant was "extremely intoxicated," and the defendant claimed that his intoxication rendered him unconscious at the time the victim was robbed and murdered. Under the facts of that case, the court held that sufficient evidence had been presented to raise an issue of fact for the jury and that the instruction should have been given. (*Feagans*, 118 Ill. App. 3d at 997.) No such evidence of extreme intoxication was presented here. Rather, as stated, the evidence indicated that defendant was in control of his actions despite the ingestion of alcohol and drugs.

■ Based on the foregoing, we therefore conclude that defendant's conviction of intentional and knowing murder (Ill. Rev. Stat. 1987, ch. 38, par. 9–1(a)(1)) is affirmed. The other two convictions, of knowing murder and felony murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9–1(a)(2), (a)(3)), are vacated. *People v. Mack* (1984), 105 Ill. 2d 103, 137.

Defendant also argues that both, or at least one, of his convictions of armed robbery must be vacated. The State correctly observes that defendant's argument in this regard is at least partially predicated on a finding that only the felony-murder conviction can stand, based on the rule that armed robbery is the lesser-included offense of felony murder. (*People v. Johnson* (1988), 167 Ill. App. 3d 659, 670.) As we have already concluded that defendant's conviction of intentional murder, not felony murder, shall be affirmed, this argument is without merit.

In the alternative, defendant argues that at least one of the convictions of armed robbery must be vacated since there was only a single taking of property. As factual support for this argument, defendant relies solely on the testimony of Thomas Hixon to the effect that, after demanding money from Thomas Goings, but before any money was produced, defendant shot Goings. Defendant then confronted Hixon who turned over money from two cash registers. Defendant contends, therefore, that, under the authority of *People v. Mack* (1984), 105 Ill. 2d 103, and *People v. Palmer* (1982), 111 Ill. App. 3d 800, only one robbery took place. We disagree.

■ First, defendant fails to point out that the testimony of Bryan Smith differed in several important aspects from that of Thomas Hixon. According to Smith's testimony, defendant told Thomas Goings to give him all the money. Goings then "emptied the first register and gave him the money." Smith then stated that defendant told Goings that this better not be all of the money and that, as Goings leaned

forward, defendant shot him. Defendant then told Hixon to give him "the rest of the money." Hixon gave defendant some change from the first register and the money from the second register. We also note at this point that Thomas Hixon testified that, while the robbery was in progress, he was looking at defendant's gun much of the time. Based on the above we believe that Bryan Smith's testimony, if believed by the jury, establishes the following sequence of events or acts. First, defendant took money from Thomas Goings; second, defendant shot Thomas Goings; and third, defendant took money from Thomas Hixon. Such facts support a finding that two separate armed robberies occurred.

Section 18—1(a) of the Criminal Code of 1961 defines robbery as follows:

> "A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force." (Ill. Rev. Stat. 1987, ch. 38, par. 18—1(a).)

The offense of robbery is complete when force or threat of force causes the victim to part with possession or custody of property against his will. (*People v. Gaines* (1981), 88 Ill. 2d 342, 367.) Since there was evidence presented that defendant took money from both Goings and Hixon, we agree that both convictions of armed robbery may be affirmed. See *Gaines*, 88 Ill. 2d at 368.

*Palmer* and *Mack*, cited by defendant, are distinguishable on the facts, but actually support the State's position from a legal standpoint. In *Palmer* the defendant was convicted of two counts of armed robbery from a 7-Eleven store cash register in the presence of two employees. However, only one of the store's employees turned over any money to the defendant. The court found that the defendant had committed but one act of armed robbery in taking money from the cash register. (*Palmer*, 111 Ill. App. 3d at 808.) As the jury could have found that defendant took money from both Goings and Hixon, *Palmer* does not require that we vacate one of defendant's armed robbery convictions.

In *Mack*, the defendant was charged with and convicted of the armed robbery of both a bank loan officer and a bank security guard in that he took money from the presence of both men. Since the evidence showed that the defendant was not charged with taking a gun from the security guard and that the money the defendant was charged with taking was the currency of the bank, the Illinois Supreme Court found that the defendant should have been convicted of only one count of armed robbery. (*Mack*, 105 Ill. 2d at 135.) The court

stated that it was not a case of "multiple takings from multiple victims" where more than one conviction of armed robbery could stand. (105 Ill. 2d at 135.) As indicated above, we believe that this is a case where "multiple takings from multiple victims" occurred. As such, both of defendant's convictions of armed robbery shall be affirmed.

Finally, defendant argues that the trial court committed several sentencing errors. Specifically, defendant contends that the trial court erred in considering an improper factor in aggravation and in determining that the offense was brutal and heinous in nature, thus permitting the imposition of a sentence of natural-life imprisonment. Defendant also contends that his 60-year extended-term sentence for armed robbery should be made concurrent with the sentence for murder and reduced to 30 years. We note at this point that defendant failed to raise any of the above issues at the sentencing hearing or in a post-trial motion. Both an objection at trial and a written post-trial motion raising the issues are required to preserve those issues for review. (*People v. Felella* (1989), 131 Ill. 2d 525, 540.) Here, defendant did not object, either at trial or in a post-trial motion, to any facet of the trial judge's imposition of sentence. As a result, defendant has waived consideration of these issues on appeal.

■■■ In any event, we have reviewed the record and conclude that defendant's arguments in this regard are without merit. First, we do not believe the trial court improperly considered in aggravation a factor that defendant's conduct caused or threatened to cause serious bodily injury that was inherent in the offense of first-degree murder. In sentencing defendant, the trial judge stated, *inter alia*, as follows:

"I have considered the statutory factors in aggravation and mitigation in the sentencing act. \*\*\*

\* \* \*

In looking at the factors in mitigation, I would have to agree with the argument that was made by the State. None of the statutory factors in mitigation are present so far as the defendant is concerned.

In looking at the other side of the coin, as far as aggravation, his conduct did cause and threatened serious harm. He didn't receive compensation from the point of view of a hired killing. That's not appropriate so it just doesn't relate. He has a history of prior criminal activity. A strong sentence is necessary to deter others from committing the same crime of the type of aggravating factors available—and that he was convicted—defendant was convicted while serving a period of probation for a prior felony. Those that are possible are there."

This is not a situation wherein the trial court focused *solely* on the victim's death, as was the case in *People v. Saldivar* (1986), 113 Ill. 2d 256, 272, and *People v. Martin* (1988), 119 Ill. 2d 453, 461. Although the trial court mentioned this factor, it was not the focal point of the court's sentencing determination. Rather, our review of the record indicates that the court's primary focus was on defendant's extensive criminal history, his lack of rehabilitative potential, and his leadership role in the crimes charged. Therefore, the trial court did not err in considering this factor in aggravation.

Second, the trial court did not err in concluding that defendant's conduct was sufficiently brutal or heinous to justify imposition of a natural-life sentence. In sentencing defendant to natural-life imprisonment, the trial court also stated as follows:

> "This case is an example of no reason, of absolute wanton, unnecessary, unreasoned, caring nothing for the rights of the lives of the persons of others act.
>
> Under the law, both based on the grounds found by the jury and the fact that this is a murder committed in the commission of a forcible felony and armed robbery, but also based on the fact that the defendant's actions were indicative and clearly indicative of wanton cruelty on his part, extended term and, therefore, natural life is available for the offense of murder."

A sentence of natural-life imprisonment may be imposed if the trial court finds that the murder was accompanied by "brutal or heinous behavior indicative of wanton cruelty" (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1)). In *People v. La Pointe* (1981), 88 Ill. 2d 482, the Illinois Supreme Court stated:

> " 'Heinous' is defined by Webster's Third New International Dictionary (unabridged) as 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal'; 'brutal' includes 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' Clearly, in our opinion, the statute does not limit the imposition of a sentence of natural life imprisonment to only those murders involving torture or the infliction of unnecessary pain." *La Pointe*, 88 Ill. 2d at 501.

See also *People v. McGee* (1984), 121 Ill. App. 3d 1086, 1090.

In *McGee*, this court upheld an extended-term sentence for attempted murder after concluding that the following factors demonstrated that the offense was accompanied by exceptionally brutal or heinous behavior:

> "[D]efendant's premeditated, senseless act in shooting the victim in apparent retribution over a previous argument; the

absence of any immediate provocation by the unarmed victim; defendant's indifference to any potential harm to the many other people around which could be caused by the shotgun blast; and defendant's shooting of the victim with a shotgun at close range which obviously would result in death or grave and permanent injury to the victim." *McGee,* 121 Ill. App. 3d at 1091.

 In light of the above, we believe that the record supports the trial judge's finding that the offense herein was accompanied by exceptionally brutal or heinous behavior, and we conclude, therefore, that the trial judge was justified in imposing a sentence of natural-life imprisonment. *People v. Andrews* (1989), 132 Ill. 2d 451, cited by defendant, is inapposite. After considering such factors as the lack of premeditation or an expression of an intent to kill prior to the crime, along with the defendant's prior record and remorse, the supreme court in *Andrews* determined that a 70-year extended-term sentence was an abuse of the trial court's discretion. (*Andrews,* 132 Ill. 2d at 466.) Defendant in the instant case had an extensive criminal history, and he was found to have exhibited a callous attitude and complete lack of remorse following the murder. Although defendant indicated remorse at his sentencing hearing, the trial judge, unlike the judge in *Andrews,* did not accept defendant's expression as sincere, stating explicitly that he did not believe defendant's statements.

The trial court's sentencing determination is entitled to great weight (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154) and will not be overturned absent an abuse of that discretion (*People v. Felella* (1989), 131 Ill. 2d 525, 541). After reviewing the record in this case, we cannot say that the trial court abused its discretion in sentencing defendant to natural-life imprisonment.

 Third, we do not believe the trial court erred when it imposed an extended-term sentence of 60 years for the armed robbery of Thomas Hixon and made that sentence consecutive to the natural-life sentence for murder. Section 5—8—4(a) of the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(a)) provides:

"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury ***."

Section 5—8—4(b) of the Code provides:

"The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(b).

The Illinois Supreme Court has held that the latter of the above sentencing provisions requires that the record show that the sentencing court is of the opinion that a consecutive sentence is necessary for the protection of the public. (*People v. Steppan* (1985), 105 Ill. 2d 310, 322.) We believe that requirement has been met in this case, where the trial court explicitly determined that consecutive sentences were necessary to protect the public from a person who, already having an extensive criminal record, committed crimes which, in the court's opinion, were indicative of a total lack of conscience or remorse. Attempting to guard against any circumstances which might eventually bring about defendant's release from prison, the judge sentenced him to consecutive sentences, stating that he was clearly without rehabilitative potential. We have reviewed the record and conclude that there can be no question that the trial judge intended the sentences to be served consecutively and was of the opinion that a consecutive sentence was necessary for the protection of the public.

In *People v. Epps* (1986), 143 Ill. App. 3d 636, this court determined that a sentence consecutive to a natural-life sentence was authorized by statute and properly imposed. (*Epps*, 143 Ill. App. 3d at 643-44.) The defendant in *Epps* was sentenced to a term of natural-life imprisonment for murder and a consecutive 60-year, extended-term sentence for attempted murder. Defendant here recognizes our prior decision in *Epps*, but urges us to adopt instead the reasoning of the partial dissent in that case, where Justice Hopf stated that the imposition of a sentence consecutive to a natural-life sentence serves no useful purpose, where a defendant already has no prospect of future release and consequently poses no threat to society. (*People v. Epps* (1986), 143 Ill. App. 3d 636, 645 (Hopf, J., dissenting).) We decline to accept defendant's offer and instead adhere to the well-reasoned majority opinion in *Epps*. (See *People v. Hattery* (1989), 183 Ill. App. 3d 785, 832.) We therefore conclude that the trial court did not err in imposing consecutive sentences in this case.

Nor do we believe that the trial court erred in imposing a 60-year extended-term sentence for the armed robbery of Thomas Hixon. In this regard, defendant argues that the armed robbery was

not accompanied by brutal and heinous behavior indicative of wanton cruelty. It has been held that a defendant's subsequent demonstration of remorse for his conduct, or the lack thereof, is an important fact in determining whether his conduct is indicative of wanton cruelty. (*People v. Nester* (1984), 123 Ill. App. 3d 501, 506, citing *People v. La Pointe* (1981), 88 Ill. 2d 482, 501.) Here, after first robbing and killing Thomas Goings, defendant then turned his gun on Hixon. Hixon therefore was not allowed to help Goings in any way and in fact had to step over Goings as he bled to death in order to comply with defendant's demands for money. As stated, the trial court did not believe any of defendant's subsequent statements of remorse. We conclude that the trial court did not abuse its discretion in sentencing defendant to an extended-term sentence.

For the reasons herein stated, the defendant's conviction and sentence for intentional first-degree murder are affirmed. The convictions of knowing murder and felony murder are vacated. Defendant's convictions of and sentences for armed robbery are affirmed.

Affirmed in part; vacated in part.

McLAREN and INGLIS, JJ., concur.